[Crim. No. 3124. In Bank.—October 31, 1928.]

THE PEOPLE, Respondent, v. CHESTER C. KEMPLEY et al., Appellants.

Dempster McKee, Adam Thompson and Edgar A. Luce for Appellants.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, W. A. Sloane, E. J. Kelley and Fred A. Steiner for Respondent.

SHENK, J.—The defendants, Chester C. Kempley and Guy Selleck, district attorney and assistant district attorney, respectively, of the county of San Diego, were charged and convicted of the crime of soliciting and accepting a bribe. They appeal from the judgment of conviction and from an order denying their motion for a new trial.

On October 7, 1926, the grand jury of said county returned an indictment charging the defendants in two counts. The first count charged that on or about the twentieth day of March, 1925, in said county of San Diego, the defendants, executive officers of the county, did "wilfully, unlawfully, feloniously and corruptly ask for and offer to receive of one William R. Johnson," a bribe in the sum of $40,000; that at said time and place the defendants represented to said William R. Johnson that if he would pay to them the sum of $40,000 they "would withhold true evidence from the trial jury during the trial of the case of the People of the State of California against Thomas A. Johnson and Hugh McGovern, Mrs. Mae Johnson and Dan McGory, then and there pending" in the superior court in and for said San Diego County; that the defendants "would withhold said true evidence and prevent the same from being presented to said trial jury during the trial" of said cause, in the following particulars: (1) that they would get possession of two certain suits of clothes belonging to said Thomas A. Johnson and Hugh McGovern, found in the attic of the house of said defendants at 2735 San Marcos Street, and would alter and cause to be made smaller said two suits of clothes so that when said Johnson and McGovern should try them on during the trial they would not fit said defendants; (2) that the defendants, as further reason for being paid said sum of $40,000, represented that they would obtain possession of a certain knife found stuck in the breast of the deceased, George McMahon, and prevent said knife from being introduced in evidence at the trial of said Thomas A. Johnson and Hugh McGovern; (3) that for the same consideration the defendants herein would not introduce in evidence an admission made by Thomas A. Johnson to the San Diego police department that he was the owner of the gun used to crack the skull of said George McMahon; (4) that the defendants herein, as a further reason why they should be paid the sum of $40,000, stated and represented to William R. Johnson that they would cause the court to make an order directing that all the exhibits introduced in evidence during the trial be delivered to the attorneys for Thomas A. Johnson and Hugh McGovern and that Mrs. Mae Johnson and Dan McGory, co-defendants with said Thomas A. Johnson and Hugh McGovern, would never be

convicted in the event that Mrs. Mae Johnson and Dan Mc-
Gory were apprehended and placed upon trial; (5) that
when the defendants herein were asking said William R.
Johnson for said $40,000 they represented to him that they
had evidence in their possession sufficient to hang the said
Thomas A. Johnson, Hugh McGovern, Mrs. Mae Johnson,
and Dan McGory and that unless the $40,000 were paid
those four persons would certainly be hanged for the murder
of George McMahon.

In the second count it was charged that the defendants
Kempley and Selleck carried out the alleged corrupt agree-
ment in all respects except that it is not charged in the sec-
ond count that the knife found in the breast of the deceased
was not introduced in evidence at the trial. It was further
charged in the second count that upon their trial the de-
fendants, Thomas A. Johnson and Hugh McGovern, were
acquitted and that the defendants herein received said sum
of $40,000 in consideration of the carrying out of their
alleged corrupt agreement; that the defendants herein repre-
sented the People at said trial and that after the verdict of
acquittal and in order to prevent the trial and conviction of
Mrs. Mae Johnson and Dan McGory, they made written
application to said court for an order releasing the exhibits
in said cause to the attorneys for the defendants, Thomas A.
Johnson and Hugh McGovern.

The defendants herein were arraigned on October 11, 1926,
and at that time moved to quash the indictment on the
grounds, (1) that said indictment was not found, indorsed,
nor presented as prescribed by the Penal Code in that it
was not voted, passed upon, nor concurred in by twelve
grand jurors; (2) that names of witnesses examined by, or
whose depositions were read before, the grand jury were not
inserted at the foot of the indictment nor indorsed thereon,
and (3) that certain persons were permitted to be present
during sessions of the grand jury when the charges embraced
in the indictment were under consideration other than the
persons permitted to be present under the provisions of sec-
tion 925 of the Penal Code, and particularly that one
Richard Kittrelle, one Mrs. Firman and one Fleming were
permitted so unlawfully to be present. Testimony respect-
ing grounds (2) and (3) was taken by the court. Upon
such evidence the court concluded that the motion was un-

supported on those two grounds. Only one point need be commented upon in this connection. When it appeared that the conduct of the district attorney and his assistant under the criminal laws of the state was to be under investigation by the grand jury, the attorney-general was requested to appoint special counsel to assist in the investigation and prosecution of the charges made against those public officials. Under date of August 19, 1926, the attorney-general in writing appointed Richard Kittrelle as special counsel to conduct the investigation and prosecution in the place and stead of the district attorney. This appointment was made under the authority of section 472 of the Political Code, which provides that "Whenever a district attorney in any county of this state, shall, for any reason, become disqualified from conducting any criminal prosecution within such county, the attorney-general may employ special counsel to conduct such prosecution." It has not been and is not now contended by the defendants that they were not disqualified in the matter of the investigation of their own conduct. Beyond question the Political Code, section 472, vested in the attorney-general the power to appoint special counsel and when appointed the authority of the special counsel would be coextensive with that of the district attorney had the latter not been disqualified (see *Sloane* v. *Hammond,* 81 Cal. App. 590 [254 Pac. 648]), including the authority to appear before and assist the grand jury to the same extent that the district attorney might have done had he not been disqualified. (See *State ex rel. Nolan* v. *District Court,* 22 Mont. 25 [55 Pac. 916]; *State ex rel. Miller* v. *District Court,* 19 N. D. 819 [Ann. Cas. 1912D, 935, 124 N. W. 417].)

 Mr. Kittrelle did not take an oath of office following his appointment as special counsel. It is contended that his appointment was therefore a nullity for failure to comply with the requirements of section 904 of the Political Code, which provides that "before any officer enters upon the duties of his office, he must take and subscribe" to the oath of office. But he actually assumed and exercised the duties of a public officer under an authorized appointment, and as such was at least an officer *de facto.* (*People* v. *Turner,* 85 Cal. 432 [24 Pac. 857]; *People* v. *Sehorn,* 116 Cal. 503

[48 Pac. 495] ; *People* v. *Cradlebaugh,* 24 Cal. App. 489 [141 Pac. 943].)

■ To sustain their first ground of the motion to quash the indictment, viz.: that it was not found, indorsed, and presented by the concurrence of twelve grand jurors, the defendants offered to prove that prior to the return of the indictment members of the grand jury who subsequently voted to return the indictment personally interviewed persons apart from regular sessions of the grand jury concerning the charges under investigation; that certain of the grand jurors from their private funds employed detectives to obtain evidence; that with the sanction and approval of certain members of the grand jury offers of aid were extended to Agnes Keller, a convicted felon, to assist her in being released on parole or otherwise if she would testify before the grand jury, and that two grand jurors, before they had heard any evidence, stated that they were going to indict the district attorney. The court sustained an objection to such offer and it is argued that if proved such facts would serve to disqualify a sufficient number of grand jurors so that the indictment was not found ''with the concurrence of at least twelve grand jurors,'' as required by section 940 of the Penal Code.

It was in evidence that at least fourteen grand jurors voted to return the indictment. It also appears that the grand jury was properly formed in the first instance. The offer of proof can, therefore, be taken in no other light than as a challenge to the individual members of the grand jury on the ground of bias or prejudice.

Prior to 1911, section 896 of the Penal Code provided for a challenge to an individual grand juror on the ground that ''a state of mind exists on his part with reference to the case, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging.'' In 1911 that section and the succeeding sections (secs. 897–901), relating to challenges to the panel and to the individual grand jurors, were repealed and section 895, which previously provided for a challenge to the panel, was amended to read: ''No challenge shall be made or allowed to the panel from which the grand jury is drawn, nor to an individual grand juror, unless when made by the court for want of qualification, as pre-

sented in the next preceding section.'' The preceding section, 894, as amended in 1911, provides: ''Before accepting a person drawn as a grand juror, the court must be satisfied that such person is duly qualified to act as such juror, but when drawn and found qualified he must be accepted unless the court, on the application of the juror and before he is sworn, shall excuse him from such service for any of the reasons prescribed in Chapter 1, Title 3, Part I (secs. 190–254), of the Code of Civil Procedure.'' The reasons for excusing persons from grand jury service as prescribed by sections 190–254 of the Code of Civil Procedure have no pertinency here. Section 907 of the Penal Code, which, with the three succeeding sections, had provided for a special grand jury, was re-enacted in 1911, so as to provide: ''Before considering a charge against any person, the foreman of the grand jury shall state to those present the matter to be considered and the person to be charged with an offense in connection therewith, and direct any member of the grand jury who has a state of mind in reference to the case or to either party which will prevent him from acting impartially and without prejudice to the substantial rights of the party to retire. Any violation of this section by the foreman or any member of the grand jury is punishable by the court as a contempt.'' The provisions of the foregoing section were not complied with; but the neglect or failure of the foreman to comply therewith is not made a ground for setting aside the indictment by section 995 of the Penal Code and section 907 contains within itself the penalty for the violation of its provisions. The first subdivision of said section 995 provides that the indictment must be set aside on the motion of the defendant if ''it is not found, endorsed and presented as provided by this Code.'' It is under this subdivision that the point now under discussion was made by the defendants. By its terms this subdivision refers to the portions of the code which prescribe the mode of finding, indorsing, and presenting an indictment. (*People* v. *Colby*, 54 Cal. 37.) Prior to 1911 an indictment could be set aside upon any ground which would have been good ground for challenge either to the panel or to an individual grand juror on account of disqualification for bias (see *People* v. *Bright*, 157 Cal. 663 [109 Pac. 33]; *People* v. *Landis*, 139 Cal. 426 [73 Pac. 153]; 14 Cal. Jur. 76). But in that year the pro-

vision of the code for the setting aside of the indictment on the ground of the bias of the grand juror was abolished. (*People* v. *Schmidt*, 33 Cal. App. 426 [165 Pac. 555].) In view of the change in the law in 1911 it must be held that since that time the bias of a grand juror has not been a ground for setting aside an indictment. It may be noted that at the same session of the legislature at which the code rules were so radically changed, a constitutional amendment was submitted to the people of the state to add section $4\frac{1}{2}$ to article VI of our fundamental law and which was ratified on October 10, 1911. The theory of the change in the law in that year would appear to have been that the return of an indictment should be the means of bringing a person accused of crime before the court for a trial of the issues more nearly as an alternative to the method of holding a defendant to answer after a preliminary examination and that irregularities attending the procedural steps should not void the proceeding provided the defendant was accorded a fair and impartial trial on the merits. We conclude that the trial court was not in error in refusing to set aside the indictment herein on any of the grounds of the defendants' motion.

The remaining contentions in support of the appeal are that the evidence is insufficient to support the verdict and that the court committed prejudicial error in admitting and rejecting certain evidence and in giving and refusing certain instructions. As to the insufficiency of the evidence, it is pointed out that the evidence, aside from that of Agnes Keller, the chief witness for the prosecution and an admitted accomplice, was as consistent with innocence as with guilt and that the evidence of the accomplice was not corroborated sufficiently to connect the defendants with the commission of the crime as required by section 1111 of the Penal Code. These contentions seem to require a brief review of the evidence.

On or about the first day of February, 1925, Thomas A. Johnson, with his wife, Mae Johnson, and their child, Hugh McGovern, George McMahon, and Dan McGory, Mrs. Johnson's father, moved from Chicago to San Diego to reside. They lived about in hotels for a time and until Johnson purchased a house on San Marcos Avenue in San Diego, which the six persons thereafter occupied as their home. On the evening of March 1, 1925, the body of a man was found on

a hillside in a new subdivision north of the San Diego River. The man had been shot, his skull had been crushed and the blade of a pocket knife, about two and one-half inches long, was imbedded in his chest in the region of the heart. A rag and some towels were found on or near the body identical in marking with similar articles later found in the San Marcos Avenue house. Upon going to that house the police officers found two suits of clothes in the attic with human blood spots thereon. The bathroom was bespotted with blood and bloody rags and towels were found in and around the premises. The body was identified as that of George Mc-Mahon. As a result of the police investigation Johnson and his wife, Hugh McGovern, and Dan McGory were charged with murder. Johnson and McGovern were apprehended. Mrs. Johnson and Dan McGory left San Diego with the child about 11 o'clock on the night of February 28th, proceeded by automobile to Los Angeles and from there disappeared to parts unknown. They were never apprehended. Johnson and McGovern were arraigned and entered pleas of not guilty. They were at first represented by attorney Arthur Dorn. Later on a brother of Thomas A. Johnson, W. R. Johnson, by name, appeared in San Diego, having come from Chicago in his brother's interest. The law firm of Sample & Hardin was substituted in the place and stead of Arthur Dorn as the attorneys for the defendants in said action through an arrangement made by W. R. Johnson at Sacramento with E. P. Sample, a member of the firm of Sample & Hardin, and while Sample, as a state senator, was in attendance upon a session of the legislature. After the adjournment of the legislature, and at the instance of Sample & Hardin, the court made an order for the taking, at Chicago, of depositions on oral interrogatories of witnesses on behalf of the defendants Johnson and McGovern. The time for the taking of such depositions was agreed upon between the district attorney and the attorneys for the defendants and Mr. Kempley arranged to be present at the taking thereof. Accordingly he left San Diego about June 2d. He had with him his wife and his small son. He arrived in Chicago on Friday, June 5th, and the depositions were taken on Monday, June 8th. On Sunday afternoon, June 7th, Kempley and his wife and boy attended a baseball game at Chicago as the guests of Senator Sample. W. R. Johnson

was also a member of the party as a guest of Senator Sample. After the depositions were taken Mr. Kempley and his wife and boy departed for Wisconsin to visit Mr. Kempley's parents and other relatives. Thereafter the Kempleys visited eastern cities and returned to California, going directly to Santa Cruz to attend the state convention of the District Attorneys' Association. At this convention Mr. Kempley was elected president of the association. At the conclusion of the convention he left for San Diego, arriving there on Sunday, June 28th. The Johnson-McGovern murder case was on for trial and went to trial on the following day. Mr. Kempley and Mr. Selleck participated in that trial, each engaging in the examination and cross-examination of witnesses and in the argument to the jury. Messrs. Sample & Hardin represented the defendants. The trial extended over a period of several days, and resulted in a verdict of acquittal of both defendants on July 3d.

On June 11, 1925, Agnes Keller was arrested on a charge of grand larceny issued out of Mr. Kempley's office. Shortly after the conclusion of the Johnson-McGovern murder case, these defendants caused the case against Agnes Keller to be brought on for trial. At the first trial the jury disagreed but on retrial she was found guilty as charged, sentenced to the state prison at San Quentin, and in due time was delivered to the warden. Just when the investigation of the charges against these defendants herein was commenced does not clearly appear. Prominent in the investigation was Mrs. M. E. Firman, a detective of the Firman Detective Service of Los Angeles, and her assistant Mr. Freeman. Mrs. Firman interviewed Agnes Keller in the penitentiary and as a result of this interview Agnes Keller appeared before the grand jury of San Diego County. Richard Kittrelle was appointed special counsel by the attorney-general on August 19, 1926. At that time the defendant Kempley was a candidate to succeed himself at the primary election held later in the same month. The indictment herein was returned on October 7, 1926. After preliminary motions had been disposed of the cause came on for trial on November 29th, resulting in a verdict of guilty as to both defendants on both counts on December 16, 1926.

Agnes Keller was taken from San Quentin to San Diego and was the principal witness for the prosecution at the

trial. She testified that she had been the owner of the Sonora Bar at Tijuana, Mexico, and had been the proprietress of a house of assignation in San Diego; that prior to January, 1923, in which month Mr. Kempley assumed his duties as district attorney, she had appeared before Mr. Kempley for preliminary examination and was held to answer on a felony charge at a time when Mr. Kempley was justice of the peace and that she had known him since that time; that in 1923 she was the proprietress of the Dearborn Hotel in San Diego, which she conducted as a hotel, a house of assignation, and a gambling house; that during that time the defendants herein, as district attorney and assistant district attorney, threatened her with red-light abatement proceedings; that she then employed Mr. Kempley to assist her in obtaining a transfer of the lease of the premises to a party satisfactory to the public authorities and paid him for his services. The record shows that the red-light abatement proceedings were actually brought by the defendants herein; that subsequently Agnes Keller vacated the Dearborn Hotel, and that in the immediately subsequent years she was interested in horse-racing and was a prominent figure in the San Diego and Tijuana underworld. She further testified that in the year 1924 she employed Mr. Selleck as her attorney in connection with some legal difficulties she was having with her ten year old son at Oakland, and that prior to the murder of George McMahon she and the defendants had been ''very friendly''; that early in March, 1925, the defendant Selleck called her to his office and asked her if she wanted to make some money, to which she replied that she did; that the defendant Selleck, in the presence of defendant Kempley, told her to go to Coroner Kelley and make inquiry about a diamond stud and a ring and $3,000 that was supposed to have belonged to George McMahon; that she should also go to the office of Arthur Dorn, try to get in touch with W. R. Johnson, and tell the latter that the charges against the four defendants in the murder case were very serious and that it would take ten or twenty thousand dollars apiece for the two defendants herein to save the defendants in the murder case from the gallows; that she met W. R. Johnson at Mr. Dorn's office and had a talk with him, and also with Mr. Dorn, after which she related the conversation she had had with them to Selleck; that she told Selleck that Johnson said he first

wanted to get possession of the knife that was found stuck in McMahon's chest as it belonged to his brother and had been involved in a Chicago murder case that had just been "fixed"; that Johnson wanted other evidence and particularly a gun that had been found in the San Marcos Avenue house; that Johnson stated that he was willing to spend any amount of money, but that when $20,000 apiece was named he said such a sum was too much and that the murder case in Chicago that "had just been squared up didn't cost one-half that much money"; that the defendant Selleck instructed her to tell Johnson that it would not do to have Dorn in the case and that the only man who should handle the case was Sample; that she later introduced W. R. Johnson to Kempley and Selleck in the latter's office; that at that time W. R. Johnson agreed to put up $40,000 if Kempley would go to Chicago with him and receive it after the defendants Johnson and McGovern had been acquitted of the murder charge and if the exhibits in the case should be released and turned over to him; that a few days later she told Kempley that W. R. Johnson had given her $500 as expense money and that she thereupon gave Kempley two or three hundred dollars out of it; that about the 6th or 7th of March she handed to the defendant Kempley an additional $500 in the defendant Selleck's office; that in her presence W. R. Johnson handed to Selleck a $1,000 bill in the latter's office, saying: "You better take this for expense money"; that about the latter part of March the defendant Kempley° told her that he was intending to go to Chicago and arrange to have the money put up there and for her not to worry— that he would take care of her; that after the defendant Kempley returned from Chicago she talked with him in Selleck's office, Selleck being present, and that at that time Kempley said to her "that he had received the money all right"; that she then asked Kempley if he had delivered the $3,000 to McMahon's sister in Chicago and he said "no," that Selleck had it; that before Kempley went to Chicago she talked to Selleck about the bloody suits of clothes that had been found in the attic of the San Marcos Avenue house and that Selleck said he thought it would be best to have them cleaned up a little, have some of the blood taken off and have them shortened or shrunk; that he could not have them exhibited to the jury in their then condition unless

Ivan Rice, a friend of his, could get on the jury; that Selleck said that if Ivan Rice was on the jury the jury could be tampered with in some way; that nothing was done with reference to cleaning or altering the suits of clothes until after the return of Kempley from Chicago when, in Selleck's office, Kempley told her it would help a whole lot "if they were fixed, some"; that thereafter Selleck called her up and told her to meet him at a drug-store at Fifth and B Streets, which she did; that she then told Selleck in effect that she would not have the clothes fixed until she was sure that W. R. Johnson had put up the money; that she later called Johnson at the Biltmore Hotel in Los Angeles, that Johnson came to San Diego and went with her to the district attorney's office where they met and talked to Kempley and Selleck; that when all of said four persons were present she asked Johnson how much money had been put up and that Johnson had replied that $40,000 had been put up in Chicago for Kempley, and $10,000 for Sample in the First National Bank of San Diego and that $1,500 had been given to Arthur Dorn; that she then said that the suits of clothes would have to be tampered with and "of course, it falls to me to do it"; that Johnson then said to Selleck, "When you sign over in the court all the evidence to me there will never be any come-back on the wife and the father"; that this conversation took place a couple of days after the return of Kempley from Chicago; that the next day after said conversation Selleck called her and asked her to meet him at Sixth and C Streets in front of Marstons, which she did, and at this meeting Selleck handed to her a bundle containing the suits of clothes, wrapped in a newspaper; that she took the clothes to her house, sent one suit "to be scoured and kind of gone over"; that this suit was returned to her by the cleaner but it did not look as if it had been cleaned and pressed, "just kind of scoured, some of the blood taken out of it"; that she shrunk the other suit herself by soaking it in gasoline over night; that she returned the two suits to Selleck at his office at which time he said he did not want the suits to fit the defendants Johnson and McGovern, like they did when the were tried on at the police station, but as they were returned to him they did not appear to be in a satisfactory condition. The defendants took the stand in their own defense and denied *in toto* that

they had said or done any of the things attributed to them by Agnes Keller, except that Selleck admitted having transacted some legal business for her at Oakland and Kempley admitted having made the trip to Chicago.

On cross-examination and otherwise Agnes Keller was impeached in every way known to the law. On her direct examination she announced her own infamy as the keeper of a house of prostitution and gambling in San Diego, and as the proprietress of a bar at Tijuana. She had been twice convicted of a felony, once in Kansas City for larceny of the person and again in San Diego for grand larceny. Numerous witnesses testified that her reputation in San Diego for truth, veracity, and integrity was extremely bad. The prosecution concedes that the defendant Kempley left San Diego about the first of June and did not return until Sunday, the day before the commencement of the trial of the murder case. Yet Agnes Keller testified that she talked with Selleck in the presence of Kempley a few days before the commencement of the trial about the alteration of the two suits of clothes. By reason of her criminal record, her bad character and her conceded inconsistent statements on the stand, the law, in its "solicitation for the protection of the citizen, watches with scrutiny" her testimony. (*People* v. *Williams*, 18 Cal. 187, 191.) Bearing upon the corrupt motive which she might entertain against these defendants, it appears from the testimony of the chief matron and an assistant matron at San Quentin that Agnes Keller stated just prior to her departure for San Diego to appear before the grand jury that if she went to San Diego to testify against some county officials she would not have to come back to prison, and that Mrs. Firman had promised her that if she would testify against them she would get a new trial. Witness Fossler also testified that Agnes Keller had stated to him in September, 1926, in San Diego, that she had been double-crossed and that "something very big" was about to transpire. It will be remembered that these defendants had prosecuted her and had brought about her conviction on October 6, 1925, on the grand larceny charge. Abundant reasons for her hope of reward, if she should testify against these defendants, and for her resentment against them are manifest from the record.

The foregoing testimony of Agnes Keller, her impeachment, and her motive have been adverted to, not for the purpose of arriving at a conclusion that her story might not be believed by the jury, but for the purpose of indicating that it is our duty to focus the spotlight on other evidence in the record which the prosecution claims measures up to the standard of corroborative evidence demanded by our law. In pursuance of this purpose, and having in mind the rules governing the functions of the trial court and jury and the powers of a reviewing court, it will be assumed that the testimony of Agnes Keller, if so corroborated, was sufficient to sustain the verdict. It is earnestly contended by the defendants that the story of Agnes Keller is inherently improbable and unworthy of belief as a matter of law. Considered in all of its dips, spurs, and angles, there is much force in the contention. But we are disposed to resolve this point against the defendants for the purpose of the disposition of this appeal and proceed to a consideration of the question of the corroboration of the testimony of Agnes Keller, who, by her own testimony, the proper ruling of the trial court with reference thereto, and the concessions of the prosecution, was in the position of an accomplice.

The law of this state on the question of corroboration is now well settled. The statutory rule is found in section 1111 of the Penal Code, which provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." This code rule has been the same since its adoption as a part of the Criminal Practice Act in 1851. In the early case of *People* v. *Ames,* 39 Cal. 403, it was said that the purpose of the statute "was to prohibit a conviction, unless there was *some* evidence, entirely exclusive of that of the accomplice, which, of itself, and without the aid of the accomplice, tended to raise at least a suspicion of the guilt of the accused." In the later case of *People* v. *Thompson,* 50 Cal. 480, this court was at pains to point out that the language of *People* v. *Ames, supra,* should not be taken as a correct statement of the rule, and that it was not intended

to lay down a rule "that if the corroborating evidence sufficed to raise merely a *suspicion* of the defendant's guilt, and nothing more, that it would be a sufficient corroboration within the meaning of section 1111." (*People* v. *Thompson, supra,* p. 482.) In *People* v. *McLean,* 84 Cal. 480 [24 Pac. 32], it was said: "But although more is required by way of corroboration than to raise a mere suspicion (see *People* v. *Thompson,* 50 Cal. 480), yet the corroborating evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense, although it is slight, and entitled, when standing by itself, to but little consideration." ■ That more is required by way of corroboration than mere suspicion is firmly embedded in our law. (*People* v. *Yeager,* 194 Cal. 452, 473 [229 Pac. 40] ; *People* v. *Kelly,* 69 Cal. App. 558, 570 [231 Pac. 767] ; *People* v. *Taylor,* 70 Cal. App. 239, 244 [232 Pac. 998] ; *People* v. *Jones,* 87 Cal. App. 482 [262 Pac. 361] ; 8 Cal. Jur. 178, 180.) The question of how much more than a mere suspicion is required in order to constitute corroboration has been answered by many cases in declaring further that "corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused." (*People* v. *Robbins,* 171 Cal. 466, 470 [154 Pac. 317] ; *People* v. *Woodcock,* 52 Cal. App. 412, 417 [199 Pac. 565] ; *People* v. *Janssen,* 74 Cal. App. 402, 407 [240 Pac. 799].) The code section is mandatory (*People* v. *Allison,* 200 Cal. 404 [253 Pac. 318]), and a conviction cannot stand unless the testimony of the accomplice is corroborated in accordance with the standards laid down by the courts in the interpretation of the statute. "The court has no discretion in the matter, but is bound to apply the statute indiscriminately to all cases whenever an accomplice appears as a witness, and the State's case depends solely upon his uncorroborated testimony." (*People* v. *Robbins,* 171 Cal. 466, 469 [154 Pac. 317, 318].) If the testimony of the accomplice is not sufficiently corroborated, the conviction of the accused is wholly wanting in a legal foundation to support it. (*People* v. *Viets,* 79 Cal. App. 576, 587 [250 Pac. 588].)

With the foregoing principles of law in mind we now turn to the record to discover in what respects, if at all, the testimony of Agnes Keller was sufficiently corroborated. By the testimony of other witnesses numerous facts were

proved. It was in evidence that in company with Arthur Dorn, W. R. Johnson went to the office of the district attorney shortly after the return of the indictments against Johnson and McGovern and there met Mr. Kempley. That the purpose of his going to interview the district attorney was to find out if the trial of his brother could not be avoided because of the effect even of a trial on the mother of the two Johnsons. It was also shown that Arthur Dorn had been substituted out of the murder case and that Sample & Hardin had become attorneys of record for the defendants in that case. Senator Sample, as a witness for the People, testified that at his invitation Kempley and his family had attended a ball game in Chicago at which W. R. Johnson also was present as one of Sample's guests. Kempley also testified that he was present on that occasion. Kempley also testified that he made an ineffectual attempt while in Chicago to interview a sister of McMahon who had theretofore indicated a desire to see him. It also appeared by undisputed evidence that Kempley was absent from San Diego during the month of June; that he attended the district attorneys' convention at Santa Cruz during the latter part of that month, and that he did not return to San Diego until the day before the trial of the murder case. The record in the murder case was introduced in evidence. The trial resulted in an acquittal of the defendants therein after a five days' trial. It also appeared that Ivan Rice was a member of the jury in that case and was the foreman who signed the verdict of acquittal. It also appeared that a few days after the return of the verdict the defendant Selleck consented in writing to the release of the exhibits in that case at a time when Mae Johnson and Dan McGory were still at large.

On the foregoing independent proof in the main the prosecution contends that the defendants have been sufficiently connected with the crimes of soliciting and receiving a bribe to satisfy the requirements of the law. The entire voluminous record in the case has been read with care and the extended briefs and arguments presented by able counsel on both sides have been carefully considered to the end that it may properly be declared whether the judgment of conviction may stand. ■ Upon a consideration of the entire record we are compelled to state that when the testi-

mony of the accomplice is eliminated from the case, as it must be, for the purpose of determining the question of corroboration (*People* v. *Robbins, supra;* 8 Cal. Jur. 178, and cases cited), the other evidence in the case has no substantial connection with any crime, is as consistent with innocence as with guilt, and that it is questionable whether it raises even a suspicion of guilt. It is significant that neither Kempley, nor Selleck, nor the district attorney's office were ever mentioned in any conversation which Agnes Keller had with any outside witness. So that the corroboration must rest alone on circumstantial evidence. No essential element of bribery may be adduced from the fact that W. R. Johnson with his attorney called on Kempley at the latter's office soon after the return of the indictment in the murder case in an endeavor to ascertain if the trial of the murder case might be avoided. If a district attorney is to be subjected even to the suspicion of bribery every time an attorney or others interested in the defense interviews him he is indeed in a precarious situation. Nor does a suspicion of bribery arise by reason of the substitution of Sample & Hardin for Arthur Dorn as counsel for the defendants. The record shows without conflict that Dorn was in poor health, verging on a nervous breakdown, at the time of the substitution, and that thereafter he was unable to attend to his business for a considerable length of time. A circumstance much stressed by the prosecution as tending to connect the defendant Kempley with the crime of bribery is the fact that he attended the baseball game in Chicago in company with Senator Sample and W. R. Johnson. It is undoubtedly true that social intercourse between opposing counsel during pending litigation is often viewed as a suspicious circumstance, especially by those interested in the litigation. Proper regard for the proprieties may well prompt the recognition of the precept to avoid the "appearance of evil," yet such social intercourse, within proper bounds, is not inconsistent with innocence and may not rise to the dignity of evidence of corruption. The presence of W. R. Johnson at the baseball party has seemed to accentuate the claim of the prosecution; but the entire incident falls short of proof that the defendant Kempley was engaged with Senator Sample and W. R. Johnson in the nefarious scheme of "throwing" the murder case by the

soliciting and the acceptance of a bribe of $40,000 or any other sum. The record shows that a sister of the murdered man was in Chicago at the time of the homicide; that she communicated with the police department of the city of San Diego, offering assistance in the prosecution of the guilty parties; that before he left San Diego Kempley examined the police file and took the address of the sister; that when in Chicago at the time of the taking of the depositions he endeavored to locate her but was misdirected as to the location of her address; and that upon his return to Chicago he telegraphed her to meet him at his hotel, but that she failed to appear before the departure of his train. There was no showing that the sister knew anything whatsoever of the circumstances attending the commission of the crime of murder or had any other information that would be helpful to the prosecution. Stress is laid upon the fact that Kempley did not return to San Diego until the day before the commencement of the murder trial, and the inference is attempted to be drawn that he was neglectful of his duties as a prosecuting officer to the extent of suggesting that he was corruptly caused to remain away. That he was interested in the affairs of the District Attorneys' Association of the state and had good reason to attend the convention at Santa Cruz in so far as his official duties would permit is evidenced by the fact that while in Santa Cruz he was elected president of the association. He testified that before he left San Diego he placed the preparation for trial of the murder case in the hands of his assistant Selleck who, it is conceded by all, was competent to discharge that important duty. The record in the murder case has been read. The evidence presented and the arguments of both Kempley and Selleck to the jury disclose that the case was presented with reasonable diligence. There was abundant evidence to convict the defendants then on trial and more directly pointing to the guilt of Thomas A. Johnson and Hugh McGovern than to the guilt of Mae Johnson and Dan McGory. The judge who presided at the trial testified in the present case that in his opinion, based wholly on the evidence produced at the former trial, the acquittal of said defendants resulted in a miscarriage of justice. From a reading of the evidence in that case we are in accord with the conclusion of the trial judge. It is true that if the

defendants in that case had been convicted the defendants herein might nevertheless be guilty of bribery, but the fact 'that the jury in that case failed to perform its duty does not rise to the dignity of a suspicion that Kempley and Selleck were bribed to thwart the prosecution. The unsatisfactory state of the record with reference to the alleged alteration of the two suits of clothes renders it unnecessary to dwell further upon that phase of the case.

The point mainly relied upon by the prosecution to connect the defendant Selleck with the commission of the alleged crime is the fact that said defendant signed a consent that the exhibits in the murder case be released at a time when the cause was still pending against Mae Johnson and Dan McGory. The clerk in the department of the judge who tried that case testified that a few days after the verdict of acquittal Senator Sample appeared before the court and made a motion that the exhibits be released; that the judge instructed him (the clerk) to prepare the order of release and secure the consent of the district attorney's office; that he prepared the order in his own handwriting designating the exhibits as Nos. 1 to 34, inclusive, without further describing them, and that he then took the document to Selleck's office and there secured the latter's signature thereto. The defendant Selleck's testimony is in accord with that of the clerk. The trial judge testified that, according to his recollection, Senator Sample made the motion for the release of the exhibits; that he requested Sample to secure the consent of the district attorney's office, and that thereupon Selleck appeared in his courtroom and consented to the release. This discrepancy in the testimony is deemed of no great significance. The trial judge further testified that he attached no importance to the release of the exhibits; that he believed that the two persons who were guilty had been prosecuted, and that if a motion to dismiss the case as to the other two defendants had been made he would have granted the same and would have thought the motion not at all unusual under the circumstances. The exhibits consisted of a wardrobe trunk containing men's clothing, chairs, and rugs from the house on San Marcus Avenue, two guns and numerous other exhibits, all of which were claimed by the defendants in the murder case. A few exhibits were also released to them which were not claimed

by them, but this is deemed of no importance. The knife and the gun which, according to Agnes Keller's testimony, were of such controlling importance to W. R. Johnson, were turned over to others, the knife to a deputy district attorney and the gun to a member of the police department. The fact that Ivan Rice served on the jury in the murder case cannot of itself be considered a suspicious circumstance tending to connect the defendants herein with the commission of the alleged crime of bribery. There was no evidence at all concerning any alleged confession of the defendants in the murder case at the time of their arrest. Consequently there is nothing in the record to support the allegations of the indictment that the defendants herein agreed to suppress such alleged confession. Other minor points on the question of corroboration are made by the prosecution, but they are not deemed of sufficient importance to merit further notice.

As to all of the claimed corroborative evidence the prosecution must fail, for it does not even show ''the commission of the offense or the circumstances thereof'' within the rule laid down in section 1111 of the Penal Code, and must further fail under the well-established rule approved in *People* v. *Robbins,* 171 Cal. 466, where, at page 470 [154 Pac. 317, 319], it is said that ''where the circumstances, when proved, taken separately or collectively, are consistent with the innocence of the accused, there is no corroboration, and the verdict of conviction thereon will be set aside.'' Therefore, eliminating, as we must, the evidence of the accomplice in order to determine whether the other evidence is sufficient to connect the defendants with the crime of bribery, we conclude that such other evidence falls far short of the legal requirements to constitute corroboration.

There is much merit in the further contention of the defendants that the *corpus delicti* was not established. This is especially true with reference to the alleged crime of accepting the bribe of $40,000. The evidence, other than that of the accomplice, is entirely insufficient to establish it. The only testimony of Agnes Keller tending to prove the receipt of the $40,000 is her uncorroborated statement that the defendant Kempley admitted after his return from Chicago that the money had been put up. In *People* v. *Vertrees,* 169 Cal. 404, it is said, at page 408 [146 Pac. 890,

892] : "It is the settled law that no conviction can be had upon the extra-judicial confession of a defendant unless such confession be corroborated by proof *aliunde* of the *corpus delicti*, and while slight proof of the *corpus delicti* has in many cases been properly held a sufficient basis for the admissions of such confessions, it is nevertheless true that the confessions and admissions of the defendant cannot be used to establish any necessary element for the commission of the crime." In the present case there is no evidence of the receipt of the money by Kempley except his alleged admission that it was put up in Chicago. However, for the purpose of this appeal it has been assumed that the *corpus delicti* had been established as to both counts of the indictment.

Numerous other contentions are advanced by the defendants. It would unduly further prolong this opinion to discuss them. What has been said sufficiently disposes of the appeal.

The judgment and order as to each defendant are reversed.

Richards, J., Waste, C. J., Preston, J., Curtis, J., Seawell, J., and Langdon, J., concurred.