[Crim. No. 3305.   First Dist., Div. One.   Oct. 30, 1957.]

THE PEOPLE, Respondent, v. LORRAINE STAKER, Appellant.

Emmet F. Hagerty and George Olshausen for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco), and Francis Mayer, Deputy District Attorney, for Respondent.

WOOD (Fred B.), J.—Defendant-appellant Lorraine Staker and defendants Isnaldo Ferrari, Mildred Hoeffner and Marie Gifford* were convicted of conspiracy (violation of

---

*There was a fifth defendant, Dorothy Ryan. She was acquitted.

Pen. Code, § 182) in that they conspired and agreed with each other and with Patricia Murray and Billie Donovan to commit the crimes of grand theft (Pen. Code, §§ 484, 487), petty theft (Pen. Code, §§ 484, 488), and receiving stolen property (Pen. Code, § 496).

Murray and Donovan were not joined as defendants. They were prosecution witnesses. They did the stealing from various retail stores in San Francisco and, so they testified, sold various items of their ill-gotten gains to the several defendants, at prices considerably under the retail listings.

Staker took the witness stand and denied having taken any part in or having had any knowledge of the alleged conspiracy.

Murray testified, in respect to various articles which the police found in Miss Staker's apartment, that she had stolen those articles and sold them to Staker, specifically: a skirt stolen from J. Magnin about two and a half years prior to the trial* (Ex. 33); a brown alligator bag, stolen from Elizabeth Arden's in 1954 (Ex. 34); a blue alligator bag, stolen from some store within two years before the trial (Ex. 35); a brown purse, stolen from one of the better stores in 1954 (Ex. 36); two sweaters, stolen from I. Magnin in 1954 (Ex. 37); a tablecloth, stolen in 1952, 1953 or 1954 (Ex. 38); a tablecloth, stolen in 1953 or 1954 (Ex. 39); a set of six white handled steak knives (with holder or container), stolen from Sloane's or Gump's or some store like that, in 1954 (Ex. 40); a set of four brown handled steak knives which Murray stole from one of the better stores and sold to Staker in 1954, was "identical" to the set introduced herein as Exhibit 41; a set of five silver or chromium colored steak knives, stolen from one of the better stores, in 1953 or 1954 (Ex. 42).

This testimony of an accomplice, of course, requires corroboration. Since one of the purposes of the corroboration requirement is that of ascertaining the truthfulness of the accomplice, more than a mere modicum or mere token of corroboration would seem logically to be indicated here. The witness Murray was serving time for grand theft. She stated that her business and occupation at the time of her arrest was shoplifting, and had been for five years. She had been stealing close to ten items a day—"about anything that a store carries," of a value from $200 to $300 a day. At the time of her

---

*The trial was held between May 22 and July 1, 1956.

shoplifting she was also a narcotics addict and had been for 14 years. A special officer working at two of the retail stores testified that Murray's reputation for truth, honesty and integrity was bad. It is observable, too, that Murray gave her testimony, concerning sales to Staker, knowing that the particular articles to which she referred had been found in Staker's apartment. In *People* v. *Kempley,* 205 Cal. 441 [271 P. 478], the Supreme Court adverted to the testimony of a similar accomplice-witness ''not for the purpose of arriving at a conclusion that her story might not be believed by the jury, but for the purpose of indicating that it is our duty to focus the spotlight on other evidence in the record which the prosecution claims measures up to the standard of corroborative evidence demanded by our law'' (p. 455).

The State's claim that Murray's testimony was sufficiently corroborated rests upon (1) Staker's possession of stolen property, (2) certain statements made by Staker about the articles in her possession which Murray said had been stolen, and (3) asserted failure of Staker to deny certain accusations.

*On the question whether these articles were stolen,* Murray's testimony is not self-sufficient. She can not corroborate herself. The only independent testimony which the prosecution produced on this issue pertained to the brown alligator bag (Ex. 34) and one of the two sweaters which comprise Exhibit 37.

The manager of the Elizabeth Arden Salon in San Francisco testified that the store had received three brown alligator handbags like Exhibit 34; that two were sold to a Mr. Frank Inouye, an employee of the store; and that the third was in stock June 30, 1954, and missing on December 31, 1954, according to the inventory records. Exhibit 34 has ''Elizabeth Arden, New York'' inscribed inside it. This is the marking on all handbags sold by the Elizabeth Arden stores throughout the country. By merely examining a bag the witness could not tell whether it came from the San Francisco or the New York store. A handbag like Exhibit 34 had disappeared from a table in the shop in 1954. The prosecution did not introduce any evidence accounting for the whereabouts of the two bags that had been sold.

One of the sweaters comprising Exhibit 37 had a green tag attached to it. The tag was in two parts. An assistant buyer in the sportswear department at I. Magnin's, the name of the store on the tag, testified that before 1955, when an article was sold, one part of the tag was ripped off and retained by the

store. (After 1955, white tags were used.) She testified that such was the procedure but that articles could go out and have gone out of the store with both tags on them; through oversight of a sales clerk, for example. There were shortages in the sweater department in 1953 and 1954 but she "couldn't tell you whether these were stolen or not, I mean, actually."

This independent testimony, which pertains to only two of the 10 items involved, is obviously very weak corroboration of the accomplice's testimony that the articles were stolen.

Before analyzing the appellant's out-of-court statements which the prosecution contends contain inconsistencies indicative of a guilty conscience and the accusations which, according to the prosecution, appellant failed to deny, we will briefly summarize appellant's evidence concerning her acquisition of Exhibits 33 to 42.

*Appellant testified*: The tan colored skirt (Ex. 33) was a gift to appellant from her sister Virginia Ellard of Bakersfield. The brown alligator bag (Ex. 34) was a gift to the witness from Marie Gifford.

The blue alligator bag (Ex. 35) was a gift to appellant from Dr. Rodney A. Yoell after his return from a trip he made into Mexico in 1952. This testimony is confirmed by the doctor who testified he first saw it in a shop window in Mexico City, went in, priced it, bought it, brought it back and gave it to Lorraine Staker as a present. Captain C. C. McCauley also confirmed: About 1952 Dr. Yoell gave Miss Staker a bag that is identical to this one; the captain happened to be there for dinner the night the doctor gave it to her; the doctor had shown this bag to the captain prior to making the presentation upon the doctor's return from Mexico; the captain had seen the blue bag many times during the last year.

The brown bag or purse (Ex. 36) appellant said she bought at the White House. The pertinent store records were produced (including a microfilm of a sales check made out to "Lorraine Staker," dated 4/11/55) which as interpreted by the store's bookkeeper and sales clerk indicated that on April 11, 1955, Miss Staker went into the handbag department, bought a bag No. 873, at a cost of $12.47 including taxes, and took it home, charging it to her account. Asked if she could recognize or identify Exhibit 36 the sales clerk said, "Well, it is a type that I sold, but I couldn't recognize it for sure."

The two sweaters (Ex. 37), appellant testified she bought in the Christmas rush of 1953, not for herself but as a gift for her niece, the witness' sister (mother of the prospective donee)

going in with her to share the cost of the purchase. Appellant's part of the purchase was $35 of the $70 total. Then the sister concluded the sweaters were too "adult" for the girl. So, appellant has been keeping them to give to the niece when the latter graduates from high school.

One of the tablecloths (Ex. 38), appellant testified, was given her by Dr. Yoell. This was confirmed by his testimony that it was given to him by the purser of one of the vessels of the steamship company for which the doctor was chief surgeon. The doctor, in turn, gave it to appellant. A customs official testified that this tablecloth is of ecru linen which could have originated anywhere but that the embroidery is hand worked, done somewhere in China, most likely around Swatow, by peasant workers in their homes.

The other tablecloth (Ex. 39), appellant said was given to her by Mrs. Zorzi. This was confirmed by Mrs. Mary Zorzi who testified that she gave it to Miss Staker around 1947 or 1948. She has been in Europe many times. Asked if she could relate this gift to one of those trips, Mrs. Zorzi said, "Yes, I told Miss Staker I would bring her a tablecloth, and I had the tablecloth. My mother left it to me, and I gave it to Miss Staker." She also gave her napkins that matched the tablecloth.

The set of six white handled steak knives (Ex. 40), appellant testified she bought at Hale's Mission Store in San Francisco. She produced the check (Ex. 0) which she used in paying for the knives. Edith Phillips, a fellow faculty member of the McKinley School where Miss Staker had been teaching for some years, testified that she was with the latter when she made this purchase at the Mission Store on November 22, 1954; these steak knives are exactly like the knives Miss Staker got that day, but in a different holder than they are in now, a holder that had an oval transparent top; Miss Staker paid by check, Miss Phillips stood there while she wrote the check. Further confirmatory evidence of this purchase was furnished by William K. Fahey, a buyer for Hale's Bay Area Stores, Adeline Daynes, the sales lady at Hale's Mission store who had made certain notations on the check (Ex. 0), and the assistant manager of that store who interpreted those notations.

The four brown handled steak knives (Ex. 41), appellant testified belonged to Dr. Yoell, given to him by Captain McCauley; they were taken by the police officers from the hall downstairs in her apartment, where some of the doctor's hunt-

ing equipment is. Captain McCauley confirmed this testimony, saying that these knives are the same or identical to the set he gave Dr. Yoell in the summer of 1952; he gave the doctor a cutlery set at the same time; he has used these knives on several occasions at Dr. Yoell's home or at the doctor's country place or at Miss Staker's.

The five silver or chromium colored steak knives (Ex. 42), according to appellant, were given to her by her sister Marie Staker, a different sister than the sister who joined in the purchase of the two sweaters (Ex. 37); when received by appellant, these knives were in the box which now holds the white bone handled knives (Ex. 40). This acquisition was confirmed by Marie Staker who said she got these knives at Charles Brown's on Market Street, in the holder which now contains Exhibit No. 40; there should be six instead of five steak knives in this group; she gave them to appellant a year ago last Christmas.

*Inconsistent out-of-court statements were made by appellant, it is claimed by the prosecution,* in respect to six articles found in her possession: the skirt (Ex. 33), the brown alligator bag (Ex. 34), the blue alligator bag (Ex. 35), the two sweaters (Ex. 37), and one of the tablecloths (Ex. 38).

Two statements were taken from appellant on the evening of her arrest and the search of her apartment;* at the office of the district attorney, each in question and answer form, a deputy district attorney propounding the questions.

*As to the skirt (Ex. 33),* Staker said it was a present from her sister. In her first statement she said, ''I assume she got it from China. I just assumed that because Dr. Yoell brought some things in for her also, so I just assumed she did.'' It bore the label, ''Tina Leser, designed by Foreman.'' Staker said she had never looked at the label, ''Never paid any attention to it.'' We see nothing inculpatory in the making of

---

*The arrest was made at appellant's apartment about 7 p. m. on January 30, 1955, followed by a search of the apartment.

Appellant and the articles seized were taken to the office of the district attorney.

The first statement was taken commencing about 8:45 p. m. Present were one police inspector, one deputy district attorney, a stenographer, and Miss Staker.

The second statement was taken commencing about 1:20 or 2:20 a.m. that same night. Present were four police inspectors, two deputy district attorneys, a stenographer, Miss Staker, and Patricia Murray.

It is observable that appellant was without the benefit of counsel during the taking of each of those statements.

such an assumption nor in the failure to examine the label; nothing to characterize as false her statement that the skirt was a gift from her sister Virginia.

*Concerning the blue alligator bag (Ex. 35)*, during the first interview the prosecutor mentioned a red bag and a blue bag, asking where she got the blue bag. She said that she bought it in Ensenada while there with Dr. Yoell in 1947, 1948, or 1949. At the trial, she said Dr. Yoell had given her Exhibit 35 when he made a trip to Mexico in 1952. In her second statement, the prosecutor said, "I show you another handbag . . ." (Whether he referred to the blue bag or the red bad, the transcript does not show.) She said she had purchased it in Ensenada around 1947 or 1948. Dr. Yoell was called in, asked if he saw anything on the table purchased on a Mexican trip in 1948, and he said "that blue alligator bag there." He said he got it in Mexico City "on a trip when she wasn't with me." Staker said (presumably to her interrogator), "You have got the two bags mixed up. There is another one he is referring to." Dr. Yoell was then excused and left the room. At the trial appellant testified that during her second statement she had been discussing the red bag when Dr. Yoell was brought in and the conversation shifted to the blue bag. Dr. Yoell testified that appellant bought the red bag (Ex. M.) in Ensenada; he was with her at the time.

*As to the sweaters (Ex. 37)*, the asserted inconsistency is the claim that appellant said she paid $45 for the two of them. Here again there is confusion in the record. During the taking of her second statement the prosecutor asked her: "Here are a couple of—at least one, but a cashmere sweater, is that what that is . . .? . . . [A.] Yes. Q. Where did you obtain this? A. . . . at Magnin's . . . either Joseph or I. Magnin's." Asked, "do you recall what you paid for it," she replied, "I imagine around $35." And this immediately followed: "Q. When did you buy that from them? A. I bought it for my niece . . ." It is a fair inference that the prosecutor and the appellant were discussing but one sweater, not two sweaters, upon that occasion.

A little later in the interview the prosecutor asked if she paid $39.95 "for this sweater alone." Appellant replied "I don't remember exactly." He then asked: "It is your recollection that you paid about $35 for both of these?" She replied, "I don't remember how much, but I know I wasn't going over that, because the family was going to give it as a present." No inconsistency clearly appears here. It seems

quite consistent with her testimony at the trial when, asked how much she paid for "these sweaters," she said ". . . my part of the price was going to be $35, and since I have learned that they were around $70, and I couldn't remember how much they were that night, I had forgotten." Asked if she was to pay half, she testified, "That is right."

*As to the tablecloth which became Exhibit No. 38,* appellant in each of her statements and upon the witness stand has consistently said it was given to her by Dr. Yoell. It happened that during her second statement Dr. Yoell was invited into the room. Asked where he saw this tablecloth for the first time, the doctor said: "I think I saw it, if that is the tablecloth I believe it is, I saw it at [Miss Staker's home] . . . Q. You never saw it before? A. If that is the tablecloth— Q. Would you look at it carefully? I'm opening it up for you now. Is that the one you saw there? A. It looks very much like one she had. I wouldn't identify it positively, of course. There were many tablecloths. I don't recall. Q. You don't recall ever seeing it before you saw it— . . . at the table in Miss Staker's home? A. Not that I know of now. There is another one I bought—— MISS STAKER: This is the one." Dr. Yoell was then excused by the prosecutor and left the room. Thereupon the prosecutor asked Miss Staker if she wished to change her statement in the light of Dr. Yoell's statement. She said "No." Further, she commented, "No, he indicates he gave me a tablecloth, but he doesn't remember." At the trial the doctor as well as the appellant testified that this tablecloth (Ex. 38) is the one he gave her. We do not find in these statements and in this testimony of Miss Staker anything of an inculpatory nature.

*Appellant's statements concerning the brown alligator bag (Ex. 34)* do present inconsistencies. In her first and second statements she said that Manuel Sousa had given her a brown alligator bag and that Marie Gifford had never given her any bags. At the trial she testified Exhibit 34 was a gift to her from Marie Gifford, not from Mr. Sousa. Asked why she had stated otherwise at the district attorney's office, she said she did not know why except that she was so upset at that time; she was extremely upset; she had not been given anything to eat that night after her arrest except that one of the officers brought her some coffee and that was all she had to eat after breakfast that day and evening and was tired from working all day. She testified that she received this bag "as a gift from Marie Gifford . . . after I returned—after school had

started, because I was away during the summer and it was at my home with a very courteous little note—gracious note." She found it at her home when she returned from out of town. She had been up in the mountains.

Marie Gifford testified that she bought this bag from Patricia Murray in July or August, 1954, for the purpose of giving it to Miss Staker, saying "Miss Staker and Dr. Yoell . . . had been so good to me." Asked to tell why she gave the bag to Miss Staker, Mrs. Gifford said "I bought it for Lorraine Staker, because when she had seen mine she liked it so well, and I figured I owed her something, because she had done me so many favors, and loaned me money different times, and Dr. Yoell has always taken care of me, my sister, my husband, and my nephew for nothing, so I bought the bag and gave it to her; took it up to her house . . . one day, and she was up to the mountains, and I left it for her."

Appellant's untrue out-of-court statements concerning her acquisition of this bag do, of course, have evidentiary value. Evidence of what? That she *conspired* to commit grand theft, petty theft and receiving stolen goods? Or, at most, that she received this bag knowing or having reason to believe it had been stolen? That the latter is the limit of its evidentiary value is suggested by *People* v. *Reingold*, 87 Cal.App.2d 382 [197 P.2d 175]. Defendant Reingold had been convicted of robbery. He was not at the scene of the crime. The active participant testified that Reingold supplied the gun used in committing the offense. A gun which was similar to that used in the robbery was found in Reingold's store. Defendant after his arrest made false statements that he did not own a gun. The reviewing court held that such evidence was insufficient corroboration. Reingold could be convicted only "on the ground that though not present he had previously advised and encouraged the robbery. There is no direct evidence, other than by the accomplice, that appellant knew the robbery was contemplated or that he knew on the morning of his arrest that a robbery had been committed, much less that he had previously advised and encouraged it. Though it be assumed that the false statements as to the ownership or possession of a gun tend strongly to show that appellant knew or at least suspected that the weapon had been used in the Genis robbery, such statements do not tend to show, though they might be regarded as creating a suspicion, that previous to the robbery he had advised and encouraged its commission. In the case at bar, the corroborating circumstances must tend

immediately and directly to connect appellant with advising and encouraging the robbery of Mrs. Genis. The statements made by appellant relative to his possession or ownership of a gun are consistent with the supposition and conclusion that he only knew of the robbery, or of the use of the gun in the robbery, if it was so used, after the commission of the crime, or that he had received some of the jewelry taken in the robbery, knowing it had been stolen." (P. 405.)

*Concerning the prosecution's claim that appellant failed to deny a number of accusatory statements* and thereby furnished sufficient corroboration of the accomplice's testimony, our examination of the record discovers little, if any, such.

The accusatory statements were made by Murray during the course of the taking of the second statement from appellant. The prosecutor would interrogate appellant concerning a particular article taken from her apartment. As soon as she told where, how and when she acquired it, he would question Murray and she each time would say that she stole that article and sold it to appellant. He would then turn to appellant and ask her what she had to say about that or whether she had anything further to say.

In this manner appellant and Murray were interrogated concerning some 13 articles including, it would appear, those that are identified as Exhibits 33 to 42, inclusive.

The prosecution claims only a few of these episodes to have involved a failure of the appellant to deny. It says that at the commencement of the taking of the second statement, appellant "said she did know Miss Murray, who looked familiar to her." (Resp. Br., p. 9.) Specifically, the following were the questions and answers thus referred to: "Q. Do you know this young lady here, Mrs. Murray? A. Yes, I have seen her. Q. What is her name? A. I don't know. Q. Where did you first see her? A. I don't know. Q. You don't know where you first saw her? A. I believe I have seen her. I don't know. Q. Have you taken a good look at her now? A. Yes. Q. You believe you have seen her somewhere, is that right? A. I believe so. Q. You don't know where you saw her? A. No. Q. Don't know her name? A. No, I don't. Q. Her name is Patricia Murray. Does that mean anything to you at all? A. No."

He then asked Murray if she knew Miss Staker. She replied that she did. He then turned to appellant, asked her how she spelled her name and then began interrogating her about various articles on the table. Later on he asked appellant how

long she had known Marie Gifford. She said, "about twenty years." Then he asked Murray how she first met appellant. Upon her replying, "It was through Mrs. Gifford," appellant spoke up and said: "I don't remember you, I really don't. You look familiar but yet I don't remember you." In response to questions, Murray narrated her account of the circumstances under which she met appellant at Mrs. Gifford's, adding that she (Murray) had seen appellant many times since. He then asked appellant: "Anything further that you care to tell us?" and she answered, "No." This last response is assigned as a failure to deny. This is not necessarily so, in view of appellant's statements made earlier during the interview. Really, what "further" need she say than what she had already said?

The prosecution also refers to her response to a question put at the conclusion of a discussion of one of the sets of steak knives. Appellant said they were given to her by her sister. He then interrogated Murray who said she stole those knives and sold them to appellant. Then came this question: "Have you any statement to make in regard to what was told about these?" Appellant answered, "No." It is not apparent that this question imposed a duty to reiterate what she had just said about these knives. It is not clear that her negative answer was inculpatory.

*This brings us to the consideration of the several instances in which appellant categorically denied accusatory statements* made by Murray during this second interview at the district attorney's office.

For example, concerning the tan dress or skirt which appellant said was a gift from her sister, Murray said she herself stole it from a department store and sold it to appellant. Asked by the prosecutor if she had "any statement to make in regard to that," appellant said: "How could you say that? I never bought it from you." Similarly after Murray said she had stolen and sold to appellant the handbag which appellant said she bought at the White House, appellant was asked if she had any statement to make and replied: "Yes, I do. I'm sure I paid for it at The White House." So, also, asked if she had anything to say about Murray's story of the theft and sale of one of the tablecloths, appellant said: "I know this is not true, absolutely."

Accusatory statements that the appellant denied were not properly admitted in evidence. They are hearsay and in the absence of an admission, such as a failure to deny under

circumstances that make silence tantamount to an admission, they come within no exception to the hearsay rule of exclusion. As said in the early case of *People* v. *Teshara,* 134 Cal. 542, 544 [66 P. 798], ''The statement made by Loucks at that time was hearsay, and Teshara made no admission of its truth, either expressly or tacitly. He expressly denied it.'' In the recent case of *People* v. *Simmons,* 28 Cal.2d 699, 712 [172 P.2d 18], the court observed: ''Accusatory statements of the character here involved are plain hearsay. They may properly find their way into the record only as admissions under the familiar exception to the hearsay rule. If the accused responds to the statement with a flat denial, there is no admission and hence nothing that may be received in evidence.'' As expressed in *People* v. *Davis,* 43 Cal.2d 661, 670-671 [276 P.2d 801]: ''[i]n the Simmons case, defendant's course of conduct throughout the interrogation . . . was such that this court concluded that replies repeatedly made by defendant to the coercive questioning indicated an obvious intention to take advantage of the privilege against self-incrimination.'' In *People* v. *Parks,* 151 Cal.App.2d 537, 538-539 [311 P.2d 874], accusatory statements were found inadmissible because defendant said at the time they were made that he did not want to talk until he consulted an attorney. In *People* v. *Butler,* 118 Cal.App.2d 16, 21 [257 P.2d 109], the allowance in evidence of accusatory statements which the defendant denied at the time made, was deemed prejudicially erroneous.

*Was the erroneous admission of Murray's accusatory statements prejudicial?* It cannot fail to have been. Not only were such accusations numerous. They received double emphasis. They went in twice, once during the prosecution's case in chief and again as a part of its cross-examination of the appellant. This emphasis and reemphasis, particularly in the light of the tenuous character of the corroborative evidence, can not be viewed otherwise than as prejudicial, requiring a reversal.

The prosecution erroneously claims that no proper objection was made to the introduction of the accusatory statements which appellant denied. Early in the trial the parties stipulated, as expressed by the court to the jury, that ''when any one of the defense counsel makes an objection or a motion, it will be deemed to be made on behalf of all defendants, unless one of the other counsel speaks up or either adds to it other reasons or grounds, or specifically states he does not want to join in the motion,'' and the counsel who makes a given

motion or objection will have the benefit of the additions made by other counsel. This stipulation was as broad as it reads and was so understood by the trial judge. During the hearing of the motions for new trial the prosecution urged that Patricia Murray's statements went in without objection. The court interrupted: ". . . excepting the objection that Murray [counsel for defendant Ryan]* made for whatever it was worth." The prosecution responded, "He made it as to his client" and the court replied, "Oh, no, no, they all adopted each other's objection." The prosecutor then said, "All right," and the court concluded: "So, that would run to Staker."

At one time during the trial appellant's counsel indicated he was not too sure if he wanted Murray's accusatory statements excluded, but a little later clearly indicated he wanted them excluded. Upon motion for new trial the court indicated there had been no waiver by or on behalf of appellant.

The judgment and the order appealed from are reversed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied November 29, 1957, and respondent's petition for a hearing by the Supreme Court was denied December 23, 1957.

---

*Counsel for defendant Hoeffner also objected to introduction of the accusatory statements.