[Crim. No. 3352. In Bank.—October 27, 1930.]

THE PEOPLE, Respondent, v. HAROLD L. DAVIS, Appellant.

Jerry Giesler, Bourke Jones, Paul B. D'Orr and Thomas A. Reynolds for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, and Robert P. Stewart, Deputy District Attorney, for Respondent.

THE COURT.—This case was transferred to this court for hearing after decision by the District Court of Appeal for the reason that we desired to give further consideration to several of the points raised by the attorney-general, particularly in reference to the question as to whether the case as written conflicted with the reasoning to be found in the recent case of *People* v. *Negra*, 208 Cal. 64 [280 Pac. 354]. For reasons later made to appear, it is our opinion that the reasoning of the District Court of Appeal is not in conflict with the reasoning of the Negra case, and it is likewise our opinion that the decision of the District Court correctly states the law applicable to this case. We, therefore, adopt as part of the opinion of this court the decision of the District Court of Appeal, Second Appellate District, Division One, written by Presiding Justice Conrey, and concurred in by Justices Houser and York, which is as follows:

"In the indictment it is charged, and the record shows, that at the times to which the indictment refers the defendant was the duly appointed, qualified and acting chief deputy district attorney of the county of Los Angeles; that at and during said time there were pending undetermined in the superior court of said county two certain criminal actions wherein the defendants (in those actions) were charged with the commission of felonious crimes; that the defendant Davis, as such chief deputy district attorney, was charged with the duty of prosecuting said criminal actions, and that one E. H. Rosenberg was one of the defendants in each of said criminal actions. In one of these actions, No. 31043, the defendants, S. C. Lewis, E. H. Rosenberg, Jacob Berman, *alias* Jack Bennett, were accused of the crime of conspiracy to obtain money by false pretense, and of the crime of conspiracy to violate the Corporate Securities Act. In the other of said

actions, No. 31044, I. L. Rouse, E. H. Rosenberg et al., were charged with the crime of conspiracy to violate the act to regulate the interest of money, known as the Usury Law. The indictment against Davis charges that on or about the 15th day of August, 1927, said Davis knowingly, etc., did ask, agree to receive and did receive from the said E. H. Rosenberg, also known as Ed Rosenberg, charged as a defendant in said actions 31043 and 31044, and from one Ben Getzoff, a bribe, to-wit, the sum of $7,500, with a corrupt intent, and an agreement thereupon then and there made that the action of him, the said Davis, as chief deputy district attorney, would be knowingly, wilfully, unlawfully, corruptly and feloniously influenced thereby, in that he, the said Davis then agreed that as such chief deputy district attorney, he would control and direct the prosecution of each and both of said causes so pending, to the end and in the manner that in so far as each and both of said causes related to the said E. H. Rosenberg, that each and both of said causes would be disposed of in such manner as to result in the discharge of the said E. H. Rosenberg without conviction. Upon trial of this cause before a jury, defendant Davis was found guilty as charged in the indictment. Pursuant to that judgment he has been sentenced to imprisonment for the term prescribed by law. He appeals from the judgment and from an order denying his motion for a new trial.

"There is no evidence of any direct negotiation or transaction between appellant and Ed Rosenberg in relation to the alleged crime of appellant. If there were any such negotiations or transactions they occurred between appellant and one Ben Getzoff acting as some kind of agent or go-between in said negotiations and in the alleged payment of the bribe. The prosecution is in no position to claim that the defendant ever did anything to comply with his supposed corrupt agreement; for if any of the evidence for the prosecution could be given that construction, it would follow that the court erred in refusing the offered evidence concerning his actual conduct, some of which defendant was not allowed to produce. ▆ The first and foremost contention of appellant is based upon the proposition that Ben Getzoff, according to his testimony, was an accomplice in the commission of the crime charged

against appellant. It is further contended by appellant that 'the evidence is legally insufficient to sustain the verdict of guilty as there is no legal corroboration of Ben Getzoff, the only witness who testifies to any of the essentials of the crime charged, and who is an accomplice, according to his own testimony'.

"In order to obtain a clear understanding of the most important elements of facts in the case, and as a basis for consideration of the various errors alleged to have been committed at the trial, it is necessary to have before us the testimony of Ben Getzoff. We shall here summarize that testimony as we find it in the record. In making this summary it should be understood that we are not quoting his exact words, except where they are placed within quotation marks. Ben Getzoff said: 'For some years I have been engaged in the tailoring business in the city of Los Angeles. In the year 1925 the defendant Davis was introduced to me by Asa Keyes, the district attorney. Thereafter I met Davis at my places of business on Spring street, including my lastest location at 609 So. Spring street; also at his office in the Hall of Justice. I have known Ed Rosenberg for five or six years. He was introduced to me by his brother, Jack Rosenberg. I have visited in the homes of the Rosenbergs and in the home of defendant Davis. In the year 1927 the Rosenbergs were engaged in the sale of stock of the Julian Petroleum Co. In May, 1927, the Julian Company was in financial difficulties. In May, 1927, I called on Davis in his office. He asked me, 'What seems to be the trouble?' I told him the trouble was that Ed and Jack Rosenberg were subpoenaed before the grand jury. The defendant said, 'You can talk to me about it. I have full charge of the case of the Julian Petroleum.' I said, they don't want to be indicted. He said that he believed that they would be indicted. He promised that if there was any possible way he would stop the indictment, at least against Jack Rosenberg. I told him, 'If you do anything for them they will appreciate it.' He said, 'All right, I will see what I can do.'

"In June there were two indictments returned against Ed Rosenberg and other defendants. That evening Davis called me up and said he had saved Jack, but Ed is indicted but not to worry about it. The next day I phoned him

and he told me to come over at two o'clock that day, which was Saturday. I was in his office at two o'clock, no one else was there. He asked me if it was really true that Ed Rosenberg is worth three million dollars. I said, 'I don't know but I do know they are wealthy.' I said, 'What are you going to do with the indictment?' He said, 'It is too early in the game. Public sentiment is too strong against it right now to do anything. Later we will see what we can do.' During July, 1927, I saw Davis at my place, 609 South Spring street, perhaps twice, and also saw him at his office. When I went to his office I would meet Mrs. Barrett, his secretary.

"In August, 1927, Davis came to my store and told me to come to his office at two o'clock, which I did. When I came into his office he asked me whether I had seen Ed Rosenberg and whether he was worried. I said, 'Yes, and he wants to know what you are going to do for his dismissal.' He said, 'I sure would love to dismiss Ed's case but it is [not] time yet, [he] don't have to worry.' Then I asked him, 'Buddy, is that true, you are going to run for district attorney?' And he asked me who told me, and I told him Asa Keyes told me that. He said, 'that is correct.' And he said, 'Do you realize, Ben, it would cost me between $35,000 and $50,000 to make the run?' for that office. I said, 'Does it take that money, Buddy?' He said, 'Yes.' He said, 'It will take every penny of it, but,' he said, 'I have some friends, if they only come through with it.' Then he told me 'Ben,' he says, 'if I want to make myself $100,000 or $200,000, I can do it right now, but,' he said, 'a man in my position you have got to be very careful with whom you do business.'

"Q. Well, what else was said, if anything?

"A. Then I told him, I said 'Buddy,' I said, 'I will tell you what I will do, I will talk to Ed Rosenberg, and I am sure that he is going to do his share.' He said, 'What do you mean, money?' I said, 'Yes.' He said, 'You think he is going to come through with anything?' I said, 'He is not a cheap piker, he will come through.' I said, 'Now, Buddy, I want to tell you something, I am going to talk to Ed as soon as I get back to the store.' He picked himself up from the chair, and he says, 'Do you realize, Ben—do you think, Ben,' he said, 'that he will come through

with $10,000?' I says, 'I do.' He says, 'That ought to be worth to him $10,000.' I says, 'If you will dismiss that case, Buddy,' I said, 'he will give you more than that, and I am sure of it.'

"Q. Anything else about that matter?

"A. Then I told him, 'As soon as I get back to the store, I will get in touch with Ed Rosenberg,' and I did.

"After I left Mr. Davis' office I had a talk with Ed Rosenberg. Then I called up defendant Davis and said to him, 'I have got what you asked for.' And he told me to meet him in the basement of the Hayward Hotel. A few minutes later he met me there, in the basement between the telephone booths. I said to him, 'I have got for you $5,000.' He said he wanted me to ask Ed Rosenberg for $2,500 more as a loan; that he had to make good on some stock he had bought on margin. I said, 'All right, you can have the $5,000, and tomorrow I will get you the balance of $2,500.' He said, 'No, I wouldn't need it tonight. You can get that tomorrow, the whole thing.' Then I left and telephoned Ed Rosenberg, and he came to my place of business. The next morning I telephoned to Buddy Davis and told him I have got the balance what he wanted. He said, 'I will meet you in the same place.' Later in the day he telephoned me and we did meet in the same place, in the basement of the Hayward Hotel. (This was next door to Getzoff's tailor shop.) When I left the store I spoke to my son David, who was working in the store. I went to the appointed place. I said to Davis, 'I have got the balance of $2,500 for you. That makes $7,500.' I had received that sum from Ed Rosenberg. It was in seven single $1,000 bills and one $500 bill. I handed it over to Buddy Davis. He said, 'The first thing tomorrow I am going to get in touch with Asa, and tell Ed not to worry anything about it, as I will take care of it.' He said, 'You know what I done for Jack, Ed's brother. I prevented his indictment. He knows I will do the right thing by him.' I said I thought it was Asa that prevented the indictment. He said, 'Asa was a liar.' While we were talking there, my son came down and told me that there was an urgent call from Ed Rosenberg. Then I went out through the Spring street side, and Davis went out through the Sixth street side.

"In September I saw Davis at his office, when he got back from up north. I was up to see him the morning when Jack Bennett came. We were figuring he was going to dismiss the case in September, and Ed and I were supposed to leave town for a vacation. Davis told me he doesn't get any help from Asa Keyes. That he believed that Keyes feels that Ed is guilty. I saw Davis again the following day. He said that Ace was yellow and had no backbone. After that I left Davis alone entirely. I next saw him in January. In November I went to Chicago with Mr. Keyes. We got back the latter part of November. After we got back I saw Davis again. That was in November or December. He said he was unable to fix it. 'I am going to send Ace a letter of resignation, and that will bring him to time. I did not see Davis again until the trial was on, not until the day before Keyes was to deliver his argument before the jury. The trial of the case in which Ed Rosenberg was defendant ended some time in May, 1928. A day or two after the trial ended, Keyes and Davis and Jack Bennett and Ed Rosenberg and myself met in my office. They were having a few drinks and congratulating one another on the outcome of the trial. It was on Saturday. Keyes left first, then Jack Bennett, then Ed Rosenberg. Then Harold Davis said to me, 'Is Ed going to come through with the balance of the $2,500?' I said to him, 'You have an awful lot of nerve to ask him for the $2,500. If you want the $2,500 you have got to ask him yourself.' He said, 'According to the circumstances, Ben, I have done the best that I knew how to do.' I had a man named Joseph Sherman working for me at the time. His cloth table was right near the window outside the office. When he worked at the cutting table he stood just by that window.

"On cross-examination of the witness Ben Getzoff, he said, 'Defendant Davis visited my house on Christmas eve, in December, 1926. He and his wife and Forrest Murray came to my apartment at Wilshire and Shatto Place. Prior to May, 1927, I had been to his house twice. I had been there in the summer of 1926. My son David took me over there. Mrs. Davis was there. Davis had been to my place and asked me if I had a bottle of whiskey. He gave me his address. I went over there and gave the bottle of

whiskey to him. Again I went to Davis' house. I think it was in the spring of 1927, on a Sunday. Nobody was home. My son went with me. I brought a reading lamp. I went there and left it right in that little hallway. I was there again in May or June. Jack Rosenberg's brother drove me there and I delivered some booze. Davis was not at home. His wife was at home and she accepted it. Again I was at Mr. Davis' home in 1928. It was at night. I went there with Mr. Keyes. Davis was there but not Mrs. Davis. Again I went there and delivered a piece of white flannel for his wife's skirt. That was in 1927. Jack Rosenberg drove me over there. He did not go in with me. I took two pieces of while flannel. I gave them to Davis. Mrs. Davis was there. When I first talked with Davis, in his office, in May, 1927, I told him, 'The Rosenbergs will do the right thing by you.' The lamp which I took out to Mr. Davis' house was a tall standing lamp with a shade for reading. I got the lamp from my son-in-law, who manufactures lamps. I took one to Asa Keyes the same Sunday. When I took the lamp to Davis' house I left it in the alcove in front of the house. There is a neighbor who lives upstairs, and the door is opened and I am going in the house, and Forrest Murray came out from the house and he says to me, 'Ben, you can leave the lamp stand right here in the little hall.' Also a man upstairs told me the same thing. Asa Keyes and E. H. Rosenberg and I were convicted of the crime of bribery in the Superior Court a few months ago.' (Date of present testimony being July 3, 1929.) Q. 'Now, the first time that you ever told this story about having paid Mr. Davis money in consideration for his promising to do something for Ed Rosenberg was after you had been convicted of bribery in the Superior Court; isn't that true? . . . A. As soon as we were indicted for accepting or giving a bribe and when we had received our transcript, and when I read in that transcript where Buddy Davis has deliberately committed perjury, before the grand jury— . . . so that is the time that I was ready . . . to go to the district attorney and tell him the whole story.' During the time of the trial before I was convicted 'I told Buron Fitts (district attorney) that it doesn't make no difference whether it will be a conviction or a hung jury or an acquittal, I will tell him all

about the whole transaction, and even told him about Buddy Davis, and so I done this right after we were convicted . . . and I told him the whole history of it. That was the following day after my conviction.'

"According to the testimony of Ben Getzoff, the defendant Davis, through Getzoff, asked Rosenberg to give him bribe-money. Likewise, according to. that testimony, the bribe when paid, was paid by Rosenberg, through Getzoff, to Davis. There is no evidence whatever of the asking for a bribe to be given by Getzoff, or the agreeing to receive or the receiving of a bribe from Getzoff. Undoubtedly, the testimony of Getzoff places him in the category of an accomplice. 'A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' (Pen Code, sec. 1111.) Upon the statement of facts contained in the testimony of Ben Getzoff, he was liable to prosecution for the identical offense charged against Davis. (Pen. Code, secs. 31 and 971; *People* v. *Anderson*, 75 Cal. App. 365, 374 [242 Pac. 906].)

"The evidence relied upon to corroborate the testimony of an accomplice must be effective for more than merely the raising of a suspicion of the defendant's guilt. But the corroborating evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense, although it is slight, and entitled, when standing by itself, to but little consideration. (*People* v. *Kempley*, 205 Cal. 441, 456 [271 Pac. 478].)

"David Getzoff, twenty-eight years old, is a son of Ben Getzoff. During the year 1927, David was associated with his father in the tailoring business at 609 South Spring street. He testified substantially as follows: In August, 1927, I returned from a vacation which I had taken during that month. One or two weeks after I came back from my vacation, an incident occurred with which the defendant and my father were concerned. This incident occurred in

the basement of the Hayward Hotel. My father spoke to me and then went out of the store. ·After that I received a telephone call. Then I went to the basement of the hotel to call my father. At that place, in a little corner between the telephone booths, I saw Mr. Davis and my father. I told my father there was a phone call for him. He asked who it was and I told him it was Ed Rosenberg. I said, 'How do you do Mr. Davis,' and he said, 'Hello, Dave.' 'Q. Did you see anything occur at that time between your father and Harold Davis as you walked toward them? A. My father handed Mr. Davis some money. Q. Could you tell how much it was? A. No, sir. Q. Could you see it? A. I saw it was money. Q. What did Mr. Davis do with it? A. I don't recall.' I left immediately. I did not stay there.

"The foregoing testimony of David Getzoff is evidence which, if believed, would be sufficient to corroborate the testimony of Ben Getzoff upon the single fact that, at the stated time and place, money passed from the hands of Ben Getzoff to the defendant. But in view of the fact that there was in this case no evidence (other than the testimony of the accomplice) that any bribe was asked for, agreed upon or paid—and no evidence even in Ben Getzoff's testimony, that the defendant ever asked him, the said Ben Getzoff, for a bribe—it cannot reasonably be said that the testimony of David Getzoff had any force as evidence tending to connect the defendant with the commission of *the offense*. First, *there must be* the offense, the crime, the *corpus delicti*. If there had been evidence produced (other than that of the accomplice) that Ed Rosenberg, defendant in the criminal action then being prosecuted by Davis, had delivered money into the hands of Ben Getzoff, for payment to Davis (or, perhaps, even for some not reasonably explained purpose), then the further evidence that Ben Getzoff thereafter paid money to Davis, might be sufficient to support the theory of a corrupt purpose, and so connect Davis therewith. In the absence of any evidence (other than that of Ben Getzoff) of any connection of Ed Rosenberg with the transaction, there remains no ground for claiming that the transaction said to have been observed by David Getzoff had any connection whatever with the payment of a bribe. In the absence of any corroborating

evidence connecting Ed Rosenberg with the transaction, the mere delivery of 'some money' (as stated by David Getzoff) by Ben Getzoff to Davis was not evidence of guilt. To make such an act criminal there must be legally sufficient evidence connecting the act with a criminal transaction, intent or purpose. 'The corroborating evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense.' (*People* v. *Kempley*, 205 Cal. 441 [271 Pac. 478, 484].) But it must do that much.

"What other evidence has been produced that could support a verdict against the defendant in this case? Ben Getzoff testified, as we have seen, concerning a visit of appellant and appellant's wife at his home, and certain other visits of himself at the home of Davis. He further testified to certain presents made by him to Davis, or to the wife of Davis. All of these are denied both by Davis and by his wife. Mr. Forrest Murray says that he never visited the home of Ben Getzoff in company with defendant and Mrs. Davis or at all, and that he never, at any time, saw Ben Getzoff come to the house of Davis with a lamp. Mrs. Davis denies the alleged visit said to have been paid by her and the defendant to the Getzoff home. She denies the incident relating to the lamp, and denies that she has ever had such a lamp. She denies the alleged present of the white flannel goods and denies that she ever had any such materials coming from Ben Getzoff. She denies that he was ever in her home or that she ever was in his home. But let it be assumed that these incidents, or some of them, as related by the witness Ben Getzoff, did take place. They had no evidentiary force concerning the crime charged, more than to create an atmosphere of suspicion.

"Besides the testimony of David Getzoff, to which we have referred, the evidence offered by way of corroboration is found in the testimony of Joseph Sherman, of Mrs. Jessie Barrett and of John J. Kessler and his wife. Sherman testified that his place of work in the Getzoff shop was not more than five feet away from a window of the office; that in June, of 1928, several days after the verdict returned in the Rosenberg case, he overheard a conversation between defendant Davis and Ben Getzoff in which he heard Davis say to Getzoff, 'Why doesn't he come across with the money? I am waiting too long.' Cross-examined about the

date of this occurrence, Sherman said that it was several days after the verdict, 'Either about two weeks or three weeks; I can't remember exactly the date.' Mrs. Barrett testified that she was secretary to the defendant in his office of chief deputy district attorney during the months of May, June, July, August and September, 1928; that she knew Ben Getzoff during that time; that he came to the office frequently and would ask for Mr. Davis and be admitted to his office. That she also made telephone connections between the defendant and Getzoff on frequent occasions.

"The testimony of John J. Kessler and his wife is the only other testimony claimed to have corroborative value. That of Mrs. Kessler requires no separate mention, since that of her husband more fully covers the same matters. Apparently the purpose of this testimony was to prove that in the face of an accusation personally made by Kessler to defendant Davis, the conduct of Davis in response to that accusation was such as to show a consciousness of guilt. It appears that at some time prior to the trial of the Rosenberg case there had been a transaction between Mrs. Kessler and Jack Rosenberg, in which Jack Rosenberg received from Mrs. Kessler 200 shares of Julian stock, and that she had been unable to obtain from him any accounting therefor. Kessler testified to an interview which he had with Davis in the office of Davis, on May 17, 1928. He went there with Mrs. Kessler and asked Davis to take Jack · Rosenberg before the grand jury for an investigation of that transaction. He said that he had found out that Jack Rosenberg had sold the stock of Mrs. Kessler, and he had told Jack that if he, Jack, did not return the money to Mrs. Kessler that he, Kessler, would go to the district attorney and swear to a warrant, and 'you will be arrested, just like your brother.' 'Q. Is this what you told Mr. Davis? A. Yes, I told Mr. Davis everything. He started to laugh. He said, "I am not afraid. The Julian case is fixed by Mr. Getzoff." ' Further on it appeared that what the witness meant to say was that in response to Kessler's threat of arrest, Jack Rosenberg laughed and said, 'I am not afraid. The Julian case is fixed by Mr. Getzoff.' Further on Kessler said, 'Mr. Davis, when I told him that— I said, "Jack Rosenberg says he is not afraid, because the

case is fixed." He says, "John, don't worry; wait until the trial will be over, and I will get you the money." ' Davis said that.

"At the conclusion of the direct examination of Mr. Kessler, defendant moved to strike out said testimony as not illustrative of any of the issues in the case and not tending to prove anything in the indictment. Strenuous but unsuccessful efforts had been made by counsel for the defendant to have this witness confine his statements to his conversation with Davis and to exclude direct statements of the conversation that he had had with Jack Rosenberg. The motion of defendant to strike out the testimony was denied. Upon a very similar record of the testimony of Mrs. Kessler, similar objections and motions made by defendant were overruled.

"The testimony of the Kesslers was offered as showing an accusatory statement made to the defendant, and showing consciousness of guilt as exhibited by the conduct of defendant in the face of such accusation. The statement made by Kessler to Davis, in the form of an alleged quotation from Jack Rosenberg, was not an accusation directed personally to Davis. The record shows that in the then pending trial of the Rosenberg case the district attorney and several deputies other than Davis were also actively connected with the prosecution. There was also the possibility that any 'fixing' of the case had been effected through contact with jurors. ■ Before the failure of a person to deny a statement of fact can be received as evidence of an admission of guilt or of consciousness of guilt it must appear that he understands that he himself is accused of the criminal act. (2 Wharton on Criminal Evidence, 10th ed., sec. 680, p. 1407; *People* v. *Hartwell*, 37 Cal. App. 799 [175 Pac. 21].) ■ We are of the opinion that the court erred in denying the motions to strike out the Kessler testimony.

"Another error of the court in relation to the Kessler testimony occurred at a later point in the trial. Jack Rosenberg was called as a witness for the defendant, and was asked whether he had a conversation with Kessler during the trial of the Rosenberg case, in which he told Kessler that he wasn't afraid of being taken before the grand jury because the case had been fixed by Getzoff. The district

attorney objected to this question on the ground that it was irrelevant and immaterial and that the conversation testified to by Kessler was a conversation of Kessler with Davis. The objection was sustained. If in fact the testimony of Kessler had been confined to his conversation with Davis, the objection to the question addressed to Jack Rosenberg would have been properly sustained for the reason that the question whether or not there had actually been such prior conversation with Jack Rosenberg would have been immaterial. But in fact Kessler had been permitted to testify and had testified, notwithstanding objections thereto, concerning a previous conversation with Jack Rosenberg, and had given a statement of that conversation. If the defendant had been permitted to produce the testimony of Jack Rosenberg denying the conversation, it would have been to that extent an impeachment of the Kessler testimony. The evidence of such prior conversation should not have been received by the court and retained in evidence by the court as against the defendant's objections, without permitting the defendant to produce testimony contradicting the same. The general rule, which excludes evidence in rebuttal of testimony concerning an immaterial matter, is based upon the fact that controversies about such matters are likely to 'lead to endless confusion.' (*Donelly* v. *Curran*, 54 Cal. 282; *People* v. *Mitchell*, 62 Cal. 411.) In the cases last cited, the irrelevant evidence had been received without any objection thereto. Moreover, the testimony which appellant sought to contradict was closely connected with the principal fact, to wit, the supposed accusation. Without such contradiction, the defendant stood helplessly prejudiced before the jury.

██ "Taking the testimony of the several witnesses offered in corroboration of the story told by Ben Getzoff, it is exceedingly doubtful whether any of it, or all of it together in and of itself amounts to corroborative evidence tending to connect the defendant with the commission of the crime charged. In order to give it effect even as tending in that direction it seems at every point necessary to interpret and explain this 'corroboration' in the light of the testimony of Ben Getzoff. It requires the testimony of Ben Getzoff to give it direction to the alleged crime, before it can be said to connect the defendant with the commission of

the crime. But the law requires that such testimony offered in corroboration of the testimony of an accomplice shall *of itself* tend to connect the defendant with the offense charged. The following quotation seems appropriate: 'As to all of the claimed corroborative evidence the prosecution must fail, for it does not even show ''the commission of the offense or the circumstances thereof'' within the rule laid down in section 1111 of the Penal Code, and must further fail under the well-established rule approved in *People* v. *Robbins,* 171 Cal. 466, where, at page 470 (154 Pac. 317, 319), it is said that ''where the circumstances, when proved, taken separately or collectively, are consistent with the innocence of the accused, there is no corroboration, and the verdict of conviction thereon will be set aside.'' Therefore, eliminating, as we must, the evidence of the accomplice in order to determine whether the other evidence is sufficient to connect the defendants with the crime of bribery, we conclude that such other evidence falls far short of the legal requirements to constitute corroboration.' (*People* v. *Kempley,* 205 Cal. 441, 461 [271 Pac. 478, 487].) The attorney-general suggests that the statements contained in the foregoing quotation should not be accepted as authority for the proposition that the corroborative evidence must show the commission of the crime. The general rule, no doubt, is that the *corpus delicti,* such as, for instance, that a certain man was murdered, may be established by testimony of an accomplice showing that the man was found dead under described circumstances indicating murder. In such case it would be only that part of his testimony implicating the defendant that would have to be corroborated by other evidence. But in the case of a prosecution of a public officer on a charge of bribery, the fact that the crime was committed and the connection of the defendant therewith are of a single inseparable nature. In such case to hold that the testimony of the accomplice alone may be accepted as sufficient proof of the *corpus delicti,* would wholly destroy the rule requiring corroboration of the testimony of an accomplice, as that rule is set forth in section 1111 of the Penal Code.

██ ''Counsel for the People claim that the defendant 'was convicted of the crime of asking a bribe of Ben Getzoff.' That is true, because this was a part of the crime

charged by the indictment, and the jury found the defendant 'guilty of asking, agreeing to receive, and receiving a bribe, a felony, as charged in the indictment.' Under instructions 23 and 26, reading them together, the court presented the case to the jury upon the theory that there was evidence which, if believed by the jury, would authorize them to find the defendant guilty of asking for a bribe, and upon the theory that this corrupt solicitation might be one occurring solely between defendant and Ben Getzoff. This theory was erroneous, because there was no evidence that the defendant asked a bribe of Ben Getzoff.

"And even if it be assumed that the so-called corroborative testimony is technically sufficient to prove the asking, agreeing to receive and receiving a bribe from Ed Rosenberg, nevertheless it leaves the case in that weak and unsatisfactory condition in which errors become important, because in such case they much more easily lead to a miscarriage of justice than in those cases where there is abundance of reliable evidence of the defendant's guilt. Section 4½ of article VI of the Constitution was not intended to mean that the mere fact that the evidence may legally be able to stand up under the weight of the judgment is sufficient reason in all cases for refusing to set aside the judgment. The phrase 'miscarriage of justice,' used as descriptive of that condition of a cause which justifies the reversal of a judgment, has no hard and fast definition. It seems assured, however, that where errors have been committed, and where the appellate court finds that upon the record it is seriously doubtful that without such errors the defendant would have been convicted, then it may well be that errors which otherwise would not be considered to be seriously prejudicial, will require a reversal. See *People* v. *Adams*, 76 Cal. App. 178, 186 [244 Pac. 106], and numerous cases there cited.

"There are numerous assignments of error, other than those to which we have referred. We do not find it necessary to elaborate upon them here. Let it be assumed that none of them would be sustained, or that if sustained they would not be of great importance. The fact that the verdict rests upon the testimony of a self-confessed accomplice in the crime of bribery (a crime which necessarily impeaches the integrity of one who takes part in its commis-

sion), the fact that there is evidence indicating that the accomplice had interested motives for testifying against the defendant, the fact that the so-called corroborative evidence is of that inconclusive character which appears in the record, and the fact that those errors occurred to which we have given attention—these things together have left the cause in a condition which entitles the appellant to a new trial.''

In answer to the contentions made on petition for hearing in this court, we add the following observations:

The attorney-general contends, in effect, that since the testimony of Ben Getzoff, summarized by the District Court of Appeal, clearly shows that Getzoff was the accomplice of Rosenberg in the offering or giving of a bribe, he could not therefore be the accomplice of Davis in the asking or receiving of a bribe; and that it therefore follows that Getzoff's testimony did not have to be corroborated. This result is *non sequitur*. It is undoubtedly true, as the evidence shows, that Getzoff was an accomplice of Rosenberg in the giving or offering of a bribe, punishable under section 67 of the Penal Code. It is likewise true that since 1915, under the amendment of that year to section 1111 of the Penal Code providing that an accomplice is one who is liable to the prosecution for the identical offense charged against the defendant on trial, the giver and receiver of a bribe are no longer accomplices one to the other (although that was formerly the law of this state, *People* v. *Coffey*, 161 Cal. 433 [39 L. R. A. (N. S.) 704, 119 Pac. 901]), inasmuch as the asking or receiving a bribe is made a separate offense from offering or giving a bribe under section 68 of the Penal Code. ██ However, when the bribe is accomplished through the medium of an agent, or go-between, or intermediary, the mere fact that the evidence is conclusive that such emissary is the agent or accomplice of one of the parties does not necessarily determine that such emissary is not likewise the agent or accomplice of the other party to the transaction. We can see no impossibility, legal or otherwise, in a person acting as the agent or accomplice of both the bribe giver and the bribe receiver. Each case, of course, must turn on its own facts and circumstances, and if there is any doubt as to the proper status of the emissary, the question is one, under proper instructions, for

the jury. (8 Cal. Jur. 277, sec. 337.) From the instructions given in this case, and from the testimony of Ben Getzoff himself, it seems reasonable to infer that the jury must have found that Getzoff was an accomplice of Davis; in fact, any other finding would be contrary to the evidence.

The attorney-general strenuously contends that the law as stated, *supra*, in reference to the amount of evidence necessary to corroborate an accomplice, while following the rule of *People* v. *Kempley, supra*, is *contra* to the rule enunciated by this court in *People* v. *Negra, supra*. We find no inconsistency in the two cases. In the Negra case, 208 Cal., at page 69, the rule is stated as follows:

"While the jury may consider the circumstance that a witness is an accomplice, in passing upon his credibility as a witness (*People* v. *Clough*, 73 Cal. 348, 354 [15 Pac. 5]), his testimony is not to be rejected merely because he is an accomplice, *and if there is other evidence which measures up to the requirement of the code, supra, tending to connect the defendant with the commission of the crime charged*, then such testimony of the accomplice is to be considered by the jury, as in any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. (*People* v. *Hoosier*, 24 Cal. App. 746 [142 Pac. 514].) The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. (*People* v. *McLean*, 84 Cal. 480 [24 Pac. 32].) The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction on the testimony of an accomplice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. (*People* v. *Martin*, 19 Cal. App. 295 [125 Pac. 919].) The defendant's own statements and admissions, made in connection with other testimony, may afford corroborating proof sufficient to sustain a verdict. (*People* v. *Armstrong*, 114 Cal. 570 [46 Pac. 611]; *People* v. *Sullivan*, 144 Cal. 471, 473 [77 Pac. 1000].) It is not necessary that the corroborating evidence should go so far as to establish by

itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged. (*People* v. *Solomon,* 6 Cal. Unrep. 305 [58 Pac. 55].)'' (Italics added.)

By the last sentence quoted above it was not intended to hold that the corroborating evidence is sufficient if it merely raises a suspicion of defendant's guilt. Any such rule would be directly contrary to the mandatory provisions of section 1111 of the Penal Code, which provides, in part, that the corroboration must be of such a nature "as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The corroborating evidence must do more than raise even a "grave suspicion" of the defendant's guilt. (*People* v. *Kempley, supra,* citing *People* v. *Robbins,* 171 Cal. 466, 470 [154 Pac. 317] ; *People* v. *Woodcock,* 52 Cal. App. 412, 417 [199 Pac. 565] ; *People* v. *Janssen,* 74 Cal. App. 402, 407 [240 Pac. 799].) As already stated, *supra,* the corroboration relied upon in this case, after excluding the accusatory statement of the Kesslers, in no way corroborates the evidence of Ben Getzoff that Rosenberg paid money to Getzoff for Davis, and that, in fact, *such money* was so paid; nor is there any corroboration of Getzoff that Davis asked for and received such money. The most that can be said is that the corroborating testimony raises a suspicion of defendant's guilt, and this, as we have seen, is not sufficient.

The judgment and the order denying defendant's motion for a new trial are reversed.