[Crim. No. 1585.  Third Appellate District.—January 26, 1938.]

THE PEOPLE, Respondent, v. ELMER SWANSON, Appellant.

E. H. Zion for Appellant.

U. S. Webb, Attorney-General, and Wilmer W. Morse, Deputy Attorney-General, for Respondent.

PLUMMER, J.—The appellant and one William Oliver were jointly charged by the district attorney with the crime of grand theft, in an information filed in the Superior Court of Merced County on June 11, 1937, and upon arraignment, entered a plea of not guilty. The trial took place thereafter, and on July 31, 1937, a verdict of guilty was rendered against the appellant. Thereafter, the appellant moved for a new trial, which was denied. Following the denial of his motion for a new trial, the appellant was sentenced to San Quentin. William Oliver, on being arraigned, entered a plea of guilty.

Upon this appeal the appellant urges two grounds for reversal: 1st. That the court erred in denying appellant's challenge to the jury panel; 2d. That the evidence is insufficient to support the verdict.

The record shows that a deputy sheriff of the county of Merced, by the name of Morse, was a witness against the appellant at a former trial, and likewise, was a witness against the appellant at the present trial. It appears from the record that the challenge interposed by the appellant to the jury panel was based upon the alleged prejudice against the appellant entertained by Deputy Sheriff Morse. The regular panel was exhausted and the court ordered a special venire. Section 1064 of the Penal Code provides that the officer summoning a special venire shall have the qualifications of a trial juror, and the challenge may be interposed to the panel by reason of any challenge that might be made against the deputy sheriff summoning the panel, that could be made against the juror. The record shows, however, that Deputy Sheriff Morse had nothing to do with selecting and summoning the special venire; that the special venire was selected and summoned by a deputy sheriff named

Doyle. There appears to be no contention in the record that Doyle was disqualified. The challenge to the panel is based upon the theory that as Morse was disqualified, his principal, the sheriff, was also disqualified, and therefore that Doyle, another deputy sheriff, was disqualified to summon the special venire.

The cases cited by appellant in support of this theory do not bear out this contention. The cases do hold that where the sheriff is disqualified, being the principal in the office, any deputy sheriff delegated by him to summon a special venire would likewise be disqualified, but the cases do not hold that because there is a disqualified deputy in the sheriff's office, a qualified deputy acting under a qualified principal would thereby be disqualified from summoning a special venire.

The record does not show the proceedings in the impanelment of the jury, and therefore it cannot be determined if the appellant exhausted all of his peremptory challenges. There being nothing in the record to the contrary, the legal presumption would follow that the appellant went to trial before an unbiased jury, and that the appellant did not exhaust all of his challenges.

The attorney-general cites a number of cases showing that no prejudice has been suffered by the appellant in the selection of the jury, and that under section 4½ of article VI of the Constitution no miscarriage of justice has been shown. The contention of the appellant in this particular seems to us so utterly lacking in merit that we refrain from extending this opinion by analyzing the cases cited by the attorney-general.

Under the second ground alleged for reversal it is strongly contended by the appellant that the evidence is insufficient to support the verdict. In considering this question an appellate court is required to consider the testimony in the record in the most favorable light for the prosecution in this particular: If there is sufficient evidence in the record, if believed by the jury, to support the verdict, then, notwithstanding there may be a strong preponderance of the evidence in favor of the appellant, the verdict of the jury, as judges of the fact, should be upheld. (*People* v. *Dukes*, 90 Cal. App. 657 [266 Pac. 558].) To the same

effect is the more recent case of *People* v. *Biggs*, (Cal. App.) 65 Pac. (2d) 75.

Almost every proposition advanced by the prosecution and all of the testimony introduced by the prosecution were controverted by the testimony introduced by the appellant. Under such circumstances it was the duty of the jury to consider the testimony and bring in such verdict as they found the testimony to support. We may here state that because there is a greater portion of the transcript occupied by testimony given by the appellant's witnesses, does not establish that the testimony introduced by the prosecution was not sufficient to justify the jury in believing the appellant guilty beyond a reasonable doubt.

The record shows that a man by the name of Glenn Gillette owned a certain band of Poland-China feeder hogs, which, on or about the 23d day of February, 1937, was being kept on a ranch known as and called the "Black Ranch" in Merced County. This band of hogs consisted of some 70 or 75 head; that shortly after the 23d day of February, 1937, it was discovered that 36 head of these hogs were missing. Upon examining the premises Gillette discovered automobile tracks leading from the vicinity of the hog corral through the orchard and out to a back road. The theft of these hogs resulted in the filing of the information upon which the prosecution based its cause against the appellant and William Oliver. The dwelling house on the Black ranch was not occupied at the time. Mr. Gillette was farming the Black ranch, and lived something over a mile distant. On the Black ranch he was keeping the band of hogs referred to.

The record shows a corral on the Black ranch and a loading chute from the corral, by means of which hogs could be loaded into trucks. An examination of this chute made shortly after the 23d day of February, 1937, showed it had been used very recently.

Oliver testified that three or four days prior to February 23, 1937, he and the appellant met at the former's ranch. The record shows in this particular that the appellant, a few days previously to the 23d of February, was looking for Oliver and inquired of one Delta Bates, on or about February 19, 1937, if she knew of a Mr. Oliver located around Merced. Upon her answering "no", the appellant stated that he believed he lived within two or three miles of Merced.

Oliver further testified that at the meeting between himself and the appellant, the appellant asked him if he knew where there were any hogs, to which he replied that he did; that he and the appellant then drove over to the Black ranch and looked at the hogs; that while at the Black ranch he and the appellant discovered the possibility of getting the hogs, of being apprehended, of making the "get-away", of where the owners lived, and the expected profits. It was agreed that Oliver would get the hogs as soon as he could and deliver them to the appellant. On the night of February 23, 1937, Oliver took his truck to the Black ranch, got a load of hogs and delivered the same to the appellant at his place in Turlock, transferring the hogs to the appellant's truck. After transferring the load he returned to the Black ranch and got a second load, which he likewise delivered to the appellant, arriving at the appellant's home shortly before daylight. Oliver further testified that appellant then prepared a bill of sale in his own favor, for the hogs, and Oliver signed it, using the fictitious name of "F. Barbano". The appellant admitted preparing the bill of sale, but denied that Oliver was the man who signed it, testifying that it was signed by a stranger from whom appellant had purchased the hogs. The handwriting expert from the state bureau of criminal identification testified that in his opinion Oliver signed the name "F. Barbano" to the bill of sale. Oliver testified further that after signing the bill of sale he went into Turlock and waited for the appellant. Appellant brought the hogs into Turlock in his truck. He met Oliver there and they proceeded to a public weigh-master and weighed the hogs. Frank B. Fowler, the public weigh-master, testified that he weighed a load of hogs for the appellant and Barbano on February 24, 1937. The hogs were then taken back to the appellant's place and unloaded and put into his corral.

The record further shows that on the same day, the 24th day of February, 1937, the appellant sold to one Anker, thirty-six head of feeder hogs. It may be here stated that the hogs taken from the Black ranch were called "feeder hogs". The color of the hogs taken from the Black ranch appears from the testimony to have been about the color of the hogs sold by the appellant to Anker.

The record further shows that the appellant, on the morning of the 24th of February, 1937, at about 8 o'clock, or a

little later, borrowed $270 from one William Sachau. The appellant, at the time of borrowing the money, told Sachau that he needed the money for the purpose of buying the hogs, and that he was in a hurry for it. The record further shows that the appellant, according to the testimony of Oliver, paid Oliver for his portion of the profits realized on the hogs. Upon being questioned later the appellant first denied having purchased any Poland-China feeders around the 23d or 24th or 25th days of February, 1937. After being confronted with the fact that he had sold these hogs on the 24th to the Anker Meat Company, the appellant stated that he bought them up in the hills. Later, the appellant stated at the trial that he purchased the hogs from a man who had them loaded in a stalled truck on the highway near Turlock. It may be here stated that the record shows the hogs taken from the Black ranch were Poland-China feeders, and that the hogs sold to Anker corresponded with that breed of hogs.

The appellant contends that Oliver's story as to the taking of the hogs was so improbable as to be ridiculous and unworthy of belief. This is something solely for the consideration of the jury. The record shows that Oliver took substantially the whole night in getting the two loads of hogs. The appellant further contends that the truck used by Oliver was so small that he could not load 18 hogs into the same. That again presents a question for the jury. We cannot take judicial notice, as contended by the appellant, that 18 hogs, weighing somewhere slightly in excess of 120 pounds apiece, could not be loaded in a truck of the size used by the witness Oliver.

The substance of the holding in *People* v. *Ralls*, 21 Cal. App. (2d) 674 [70 Pac. (2d) 265], and the cases there cited, is to the effect that an appellate court is not authorized to reject the testimony of a witness unless it is inherently improbable, and there is nothing in the record in this case which indicates to us that where hogs are in a corral, and there is a loading chute, that one man may not load a truck twice during the night, with approximately 18 hogs in each load.

The record shows a number of trips made here and there by the appellant on the morning of the 24th day of February, 1937, but the hogs in question were not delivered to Anker

at all between 12 and 1 of that day, and there is no dispute of the fact that the appellant actually sold hogs to Anker between the hours mentioned on the day stated.

█ Upon his motion for a new trial the appellant introduced several affidavits which were controverted by affidavits introduced by the prosecution. In his brief the appellant calls our attention to the affidavits without specifying any particular reason why a new trial should be granted by reason of what is stated in the affidavits. For this reason we do not feel compelled to call attention to the specific facts testified to, either by the affiants for the appellant or affiants for the prosecution, further than to state that the action of the trial court in refusing to grant a new trial based upon the affidavits, is conclusive upon us, unless it is shown that the trial court abused its discretion. Nothing of that kind is presented for our consideration.

Much testimony is introduced by the appellant to contradict the greater portion of the testimony which we have recited, as shown by the record. That, however, does not alone justify a reversal. If believed by the jury, what we have set forth is amply sufficient to justify the verdict.

The order and judgment are affirmed.

Thompson, J., and Pullen, P. J., concurred.