[Crim. No. 525. Fourth Appellate District.—October 27, 1939.]

THE PEOPLE, Respondent, v. CHRIS HANKS, Appellant.

Frank Curran and Matt Goldstein for Appellant.

Earl Warren, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

GRIFFIN, J.—Appellant Chris Hanks and one Milton J. Pemble were indicted for the offenses of arson and conspiracy to commit arson. Pemble entered a plea of guilty to the offense of attempt to commit arson and testified against appellant. Appellant was convicted of attempt to commit arson and conspiracy. This appeal is taken from the final judgment of conviction and from the order denying the appellant's motion for a new trial.

Subsequent to the denying of the motion for new trial appellant filed a "notice of motion for leave to renew his motion for a new trial, or in the alternative for a writ of

*coram nobis''.* This motion was dismissed by the court for lack of jurisdiction, from which an appeal has been taken.

The points relied upon by appellant for a reversal of the judgment and order denying his motion for new trial are misconduct of a juror, insufficiency of the evidence, and misconduct of the district attorney.

Appellant owned the Hanks' Cafe, located at 1833 Tulare Street in the city of Fresno. The establishment was divided by partitions into three compartments, namely, a lunch counter, bar, and gambling room, under which was a spacious basement. Appellant permitted Pemble to operate the lunch counter for what he could make out of it, free of rent for use of the space and equipment which was owned by appellant. He leased the bar to a Dan McDonald at a rental of $4 a day. Appellant personally conducted the gambling department in the remaining portion of the storeroom. The testimony indicates that before gambling was closed by the mayor of the city in September, 1938, the place earned considerable profits, but thereafter the profits gradually decreased. McDonald stopped paying rent on the understanding that when times picked up appellant and he would agree upon the rent to be paid until he could pay the regular rental. In 1937 and 1938 appellant maintained insurance on the equipment in the amount of $6,000, which on December 18, 1938, was increased to $7,000 upon adding more equipment, which insurance was in effect on the 6th day of April, 1939, the day of the fire hereinafter mentioned. On February 24, 1939, seven weeks before the fire, the premium of $214.20 was paid on the policies. About three weeks before the fire, appellant and J. L. Burns, a card dealer in the establishment, took an inventory of the property in the place. It was stipulated that the *cost price* of the equipment was about $9,495.65. Appellant, at the time of the fire, was indebted to several creditors in Fresno for equipment, loans, gas and light bills, and nine months' back rent on the cafe at $100 per month, all totaling about $2,-500. The profits that appellant had made from the establishment had been put into clubs in Madera County in which he was interested. He also had removed some of the chairs, tables and poker chips and had taken them to these clubs. Shortly before the fire, appellant ordered J. R. Hatfield, who worked with Pemble in the restaurant, to secure some gaso-

line for appellant in a gallon jug which jug appellant obtained from McDonald. Hatfield, upon returning with the jug of gasoline from a near-by Richfield station, set it down at the kitchen door as directed by appellant. It was then carried downstairs by one Jimmie Hixon, at appellant's request, and placed by him on the table. Appellant claims he was going to use the gasoline in connection with the painting work that was being done on his boat. At about 5:25 o'clock on the morning of April 6, 1939, police officers, while passing the alley by Hanks' Cafe in their car, detected the odor of smoke. Upon investigating the premises, they discovered that the window in the side door to the alley had been broken and that all the doors were closed except the door to the alley. They then notified the fire department. The fire marshal responded to the call and found smoke in the basement and evidence of a set fire. It appeared also that a burglary had been committed. Fires had been started in about 28 different places. They were set on the stringers of the beams underneath the floors, in the basement. A paper cup with gasoline in it was used in the majority of cases and they had all burned except four. The fire had eaten into the wood in several different places. There was gasoline in the cups that had not burned and also in a jug. The amount of gasoline remaining in the jug and the amount used in the cups, taken together, was sufficient to have destroyed the building but the building had not burned completely because the fires had not enough body to them. They were of short duration and acted more or less like powder. The marshal found shavings under certain holes that were bored in the floor of the building. He also identified a pinch bar as having first been seen by him in the basement near some whiskey cases. He also found a broken-open money box and three keys near by. The stick used to light the fires was found in the basement. The safe in the office was open and the drawers were pulled out. However, the money was not kept in the safe but in a tin box called the chip drawer. Pemble knew where the money was kept.

Pemble, the accomplice, testified that he had been convicted of a felony and served a term in a penal institution therefor; that he had known appellant since the early part of 1936; that he operated the cafe for about three months; that he was frequently with appellant and that since gambling closed on the 20th day of September, 1938, there hadn't

been a great number of people coming in there; that about four weeks before the fire he had a conversation with appellant with reference thereto; that this conversation took place in the kitchen near the lunch counter and that then the appellant asked him what he would do for $200; that he then said: "Well, I don't know, Chris. That would depend a great deal. There are things I would do for $200. However, I am a good listener"; that appellant did not make any real proposition at that time but asked him if he would go riding with him that evening and on that evening they went to some gambling place; that he and defendant were alone in the car and that while they were riding appellant approached him on the subject of burning the building; that appellant asked him if he would consider burning the building for a consideration of $250, and he told appellant that he would; that appellant said that there was another party he could get and wanted to know if he would go through with it; that if he would not, there was time enough to back out, and that he could get someone else; that he told appellant that he would go ahead with it; that at another time, while at appellant's home, appellant was in his garage burning a liquid in a little glass dish and that later that evening he discussed with appellant the method that was to be used in setting the fire; that he told appellant how he wished to do it and that was by piling up the tables and chairs downstairs and placing loose papers around them and burning them in possibly six or eight different places; that appellant said "No, it must not be done that way"; that he told him it must be done with wax paper cups, possibly thirty or more, and put in certain places, and that he (Pemble) was to put gasoline in the cups and then light them; that this conversation took place about two weeks before appellant intended to leave the city; that appellant told him that a burglary must be committed to make it appear as an "outside job"; that he was given a key to the front door, possibly ten days or two weeks before the fire, which was after arrangements had been made for the setting of the fire; that he did not have a key up to that time; that the safe was not locked and he was to practice on it until he learned the combination, and that appellant gave him the combination to the safe, which was written down on a piece of paper and handed to him, which he memorized.

After his arrest Pemble recited the combination of the safe to an officer. Pemble further testified that in the conversations he had with appellant, a time was mentioned when the fire should be set, which was to be after 3 o'clock in the morning; that he knew when appellant left town; that the fire was to be set while appellant was away; that about three weeks before the fire, appellant and he bored holes in the floor, possibly a dozen holes, and that that was done some time after 12 o'clock midnight after the place was closed; that the holes were bored with a brace and bit and that he had not seen the bit before but had seen the brace from time to time; that he did the drilling and the appellant was with him at the time; that they first took a ride in the automobile and later returned and entered the place; that appellant mentioned that the holes were to be bored to create a draft; that the paper cups were brought there by appellant and that there were about 30 in number; that the gasoline had been left down there near a table but that he did not know when it was brought there and that appellant had told him that it was taken down there and was in a gallon wine jug; that he had a conversation with appellant with reference to where the cups should be placed and was shown where to place them in the basement; that they were to be placed on the stringers as described; that he did not get any equipment himself for the purpose of starting the fire except a pair of gloves; that appellant bought a pair of gloves one day but he could not use them because they were too small and in bad shape; that he then went and bought gloves himself; that he did not have any equipment in the place himself and all dishes and all the utensils belonged to appellant; that he had no insurance of any kind and that his only capacity there was to make what he could out of the cafe; that one Saturday afternoon when appellant left on a trip, he had been given a key to the place and was instructed to get into the safe and obtain a little metal box where the money was kept; that appellant gave him a little bar to open it, and that he used the bar in his work; that on the night before the fire he left the place not later than 12:15 o'clock, and that appellant had returned from his trip at the time and inquired as to why he had not set the fire while he was gone; that he told appellant that he could not, ''that he couldn't get clear so he wouldn't be seen and recognized''; that it was not over

two days after appellant returned to Fresno that the fire occurred; that on the morning of the fire he entered shortly after the place was closed; that he had made preparations prior thereto to get in and had thrown the bolt back on the east rear door and also had thrown the hasp back on a wide door that led in from the alley; that he then left the place with McDonald and Burns and one other party; that he returned about 15 minutes later and went directly to the alley door where he had thrown the wide door open, and closed it and threw the hasp back so no one could enter from the outside; that he entered the building through the east rear door and that he took the key and unlocked the padlock that leads out into the alley on the west side and obtained the keys for the metal box, as he had been shown where they were; that he then used the bar and pried open the drawers and took about $15 or $20 from the box; that shortly after he entered the place he prepared the cups and that the cups were in a paper sack in the ice box; that the jug of gasoline was in the basement by one of the tables and that he filled about 30 of the cups with gasoline and placed them on the beam, and in three places on rock pillars and then set them on fire with a stick on which there was some striped material, like mattress or tick material; that he knew that he had overlooked two of the cups but could not turn back to light them because it was getting too hot in there, so he went up through the cellar door and out the alley; that he broke the glass in the door and threw the padlock across the alley and went directly to his room, hid the gloves and the key and washed his hands; that appellant had told him to throw the key away and about two days later, on the way through the tunnel leading from Fresno and H Streets, he pitched it on the rock wall on the left-hand side; that on the next evening he went to appellant's home and in the presence of a Mrs. Hart he expressed regrets that anything like that had been done, and that later that evening, while riding with appellant, they had a conversation with reference to the matter, at which time appellant told him he was going to get him a lawyer; that on the morning he was arrested appellant gave him $10 and told him that it would ''get him by up at Fish Camp until he could get something to do''; that he was arrested before he was able to get away to Fish Camp.

Fire Marshal L. A. Moore, after having a conversation with Pemble, had occasion to go and search for a key at the subway. The key was found and with it the fire marshal opened the front door of appellant's cafe. Appellant admitted in his presence that he had moved some chairs and tables to a place just outside the city of Fresno.

J. R. Hatfield, a witness for the People, testified that he was employed at the cafe, and that on the night before the fire, when McDonald and Pemble were leaving the cafe and got almost to the door, Pemble said: "I forgot", and went back to the kitchen and was gone for about a minute before he returned.

S. A. Meek, detective sergeant, testified that he found an inventory of the property located in the cafe building, a gun and other things in appellant's automobile on the day of the fire.

Appellant Hanks denied any conversation with Pemble relating to the conspiracy; denied that his debts were large or unusual; admitted that he owed his landlord nine months' rent, but pointed out that on a previous occasion he had owed him eight months' rent. He denied any knowledge of or participation in the alleged conspiracy to burn down the establishment and further testified that he had been making a profit out of the establishment even after the public poker games were closed down by the police department.

A Mrs. Hart, a lady friend of appellant, testified that she had been approached by Pemble, who had been quite attentive to her, to go with him to Utah and live while he developed a gold mine which he claimed he had discovered there.

Pemble admitted this fact in substance. No one except Pemble testified with respect to any of the conversations giving rise to the alleged conspiracy. There was testimony by witnesses with respect to the purchase of a gallon of gasoline at a Richfield station near Hanks' Cafe, which was admittedly made at the request of Hanks.

Appellant strenuously maintains that the evidence, independent of the testimony of the accomplice, was not corroborated by other evidence tending to connect the appellant with the commission of the offense, and in this connection also argues that the witness Pemble was so unreliable and untrustworthy that his testimony was unworthy of belief, citing section 1111, Penal Code; *People* v. *Kempley*, 205 Cal. 441 [271 Pac. 478]; *People* v. *Robbins*, 171 Cal. 466 [154

Pac. 317]; *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32]; *People* v. *Taber,* 13 Cal. App. (2d) 27 [55 Pac. (2d) 1189], and other similar cases.

Appellant admitted the episode where Pemble claimed that appellant burned some liquid in a glass dish in his garage for the purpose of testing its effect and accounts for it in the following manner: That he was testing benzine to determine why it would not start the engine in his boy's airplane. Appellant also admitted that Pemble came to his home on the night of the fire or the next day, and conversed with him. He stated that on the day before Pemble was arrested he gave him one dollar for the purpose of buying napkins, but did not give him $10 as claimed by Pemble. Appellant further admitted taking a trip shortly before the fire. He denied ever giving Pemble the combination to the safe.

Pemble was called before the grand jury and testified prior to the return of the indictment. From the record it appears that there was some evidence bearing on the inducement of the accomplice Pemble to there testify of his participation in the crime. He admittedly had been previously convicted of a felony. He testified that some person connected with the fire department consulted him regarding going before the *grand jury* and admitting that he had set the fire, and testified that "they told me that I may not go to San Quentin" and that "it would be easier for me if I told" and "I believed I could get out of it lighter", and acting on what they said he stated that he went before the grand jury and testified that *he had set the fire.*

Appellant further argues in this connection that Pemble had a motive in endeavoring to try to fasten the crime on appellant, due to the fact that Mrs. Hart, who was Hanks' "girl", was also the object of Pemble's affections and that he admittedly tried to induce her to give up Hanks and go with him to an alleged gold mine in Utah. It is therefore claimed that his testimony, which connected appellant with the commission of the offense, was actuated not only by jealousy but also by the claimed promise of leniency.

It is to be further noted that after Pemble was committed to the state prison and after the court denied the motion for new trial, in a letter dated June 9, 1939, directed to counsel for appellant, Pemble claimed that he had made unfair statements against appellant due to certain facts therein. re-

lated. On June 20, 1939, Pemble made and thereafter appellant attempted to present an affidavit exonerating Hanks and assuming the entire responsibility. This affidavit was presented after the court denied a motion for new trial and after the notice of appeal was given, upon a motion dated June 21, 1939, entitled "Motion for Leave to Renew Motion for New Trial or in the Alternative for a Writ of *Coram Nobis*", which said motion was dismissed for lack of jurisdiction of the court to act in the matter on the date presented.

We will first dispose of the question of the sufficiency of the evidence to warrant the conviction. Appellant likens the witness Pemble to the witness Agnes Keller, in *People* v. *Kempley, supra,* where the judgment was reversed by the Supreme Court on the ground of the insufficiency of the corroborative evidence to prove the *corpus delicti* of the offense. The *corpus delicti* in the instant case on the charge of attempt to commit arson was unquestionably proved by evidence independent of the testimony given by the witness Pemble, which was not the case in *People* v. *Kempley, supra,* where the defendant was convicted of soliciting and accepting a bribe. Therefore, in the instant case, on the charge of attempt to commit arson, we are confronted only with connecting the appellant with the commission of the crime by evidence other than the testimony of the accomplice. The circumstance of the impoverishment of the appellant, the amount of insurance carried, the finding of an inventory of the contents of the building in appellant's car, the lack of motive of Pemble, and the probable motive of appellant to burn the building, together with the corroborative circumstances heretofore related and the admitted fact that appellant ordered the gasoline by which the building was attempted to be ignited, in our opinion, are facts sufficient to corroborate the testimony of the accomplice, and to connect the appellant with the commission of the offenses of which he was accused. The jurors accepted the entire testimony and under correct instructions, passed upon its weight and the credibility of the witnesses who gave it. Its weight and the credibility of the witnesses were again passed upon by the trial court on a motion for a new trial, which was denied. We find no legal ground for disagreeing with the court and jury. (*People* v. *Tinnin,* 136 Cal. App. 301 [28 Pac. (2d) 951]; *People* v. *Negra,* 208 Cal. 64 [280 Pac. 354]; *People* v. *Armstrong,*

114 Cal. 570 [46 Pac. 611]; *People* v. *Davis, supra*; *People* v. *Nikolich*, 93 Cal. App. 356 [269 Pac. 721].) In fact, the corroborative evidence is much stronger than is to be found in some of the cases above cited, where the court held it to be weak and meager and yet confirmed the conviction.

It should be noted that any claimed inducement held out to Pemble was in regard to *Pemble's admission of guilt before the grand jury.* The record does not disclose any evidence of a promise of leniency if he would testify at the trial against the appellant herein. Standing alone, we are not inclined to attach a great amount of significance to this complaint after the trial court had fully considered it on the motion for a new trial. Notwithstanding the accomplice may have been impeached by his admission that he had been previously convicted of a felony, the jury had the right to believe or disbelieve the witness. (*People* v. *Putman*, 129 Cal. 258 [61 Pac. 961].)

We next approach the ruling of the court on appellant's ''Motion for Leave to Renew Motion for New Trial or in the Alternative for a Writ of *Coram Nobis''.* Appellant apparently has abandoned his appeal from the order dismissing this motion because he does not argue the same in his brief nor does he cite authorities supporting the merits of his appeal from this order. He attempts, however, to make use of the affidavits filed in connection therewith, in his argument on appeal from the order denying his motion for new trial.

█ The appeal from the order dismissing his motion for leave to renew his motion for a new trial is without legal merit. It is well settled in this state that once a motion for a new trial has been ruled upon in a criminal case and an order made either granting or denying such application, the only remedy for the party deeming himself aggrieved is by an appeal from such order, for the court is without authority to entertain a subsequent motion the object of which is to change or vacate its former order. (*People* v. *Paysen*, 123 Cal. App. 396, 399 [11 Pac. (2d) 431], and cases cited.)

█ In reference to the writ of *coram nobis* based on newly discovered evidence, the cases of *People* v. *Mooney*, 178 Cal. 525 [174 Pac. 325], and *People* v. *Paysen, supra*, clearly establish the law that the trial court had no jurisdiction to entertain the motion at the time presented and upon the ground stated. (See, also, 8 Cal. Jur., sec. 496, p. 480,

and cases cited; *Humphreys* v. *State,* 129 Wash. 309 [224 Pac. 937, 33 A. L. R. 84]; *Asbell* v. *State,* 62 Kan. 209 [61 Pac. 690].) The motion for leave to renew the motion for new trial or in the alternative for a writ of *coram nobis* should have been dismissed.

■ As to the claimed misconduct of a certain juror, appellant believes that the court erred in denying his motion for a new trial predicated on this ground because of the serious charges made against one of the jurors. Appellant filed four affidavits in support of his motion. Three affidavits were filed on behalf of the People denying the truth of the charges contained in the appellant's affidavits. The court after due consideration denied the motion. The substance of the charges contained in the affidavits filed by appellant is that one of the jurors was biased and prejudiced against the appellant before the juror was selected and had so expressed himself. The juror, in his affidavits, denied that he was biased or prejudiced and denied having made the statements attributed to him. At the time of the hearing of the motion, the appellant filed a further affidavit made by another juror, one of the 12 jurors who rendered the verdicts, reiterating the substance of the charges set forth in the affidavits theretofore filed by appellant, which affidavit must be disregarded because jurors are not permitted to impeach their own verdicts. (*People* v. *Maggio,* 90 Cal. App. 683 [266 Pac. 813].) We have examined the affidavits in full and are convinced that only a conflict of evidence was presented which the trial court resolved against the appellant. There appears no abuse of discretion. It is an elementary principle of law that a motion for a new trial is addressed to the sound discretion of the trial court and its action will not be disturbed on appeal except in an instance manifesting a clear and unmistakable abuse of such discretion. (*People* v. *McCord,* 15 Cal. App. (2d) 136 [59 Pac. (2d) 587]; *People* v. *Bispham,* 26 Cal. App. (2d) 216 [79 Pac. (2d) 166]; *People* v. *Swanson,* 24 Cal. App. (2d) 544 [75 Pac. (2d) 623].)

■ Appellant next assigns as error certain remarks made by the district attorney in his argument to the jury one of which related to the district attorney's personal knowledge of certain facts pertaining to the employment of an attorney for appellant. While there was some evidence on the subject, the district attorney had no legal authority to supply

evidence of facts not appearing in the record. However, the argument and statement involved could have had no particular bearing on the innocence or guilt of the appellant. No objection to the argument was made at the time and no request was made to the jury to disregard it. Under such circumstances, appellant is not now in a position to complain. (*People* v. *Carson,* 49 Cal. App. 12, 17 [192 Pac. 318].)

Appellant next complains of the remark by the district attorney to the jury that "He (Hanks) borrowed $100 despite that fact to take this trip, and it is in the statement that we took, to take this trip out here when this place was supposed to be burned." There was no statement taken by the district attorney received in evidence. Therefore, no reference should have been made to it. However, appellant admitted on cross-examination, when asked if he did not tell "us" at the time he was questioned on the 6th day of April about having borrowed $100 to make the "trip", that he might have said it. Therefore, whether the statement was placed in evidence, assuming that a written statement was taken, it is of no moment and the reference to such statement, under the circumstances, was not prejudicial.

Appellant next argues that the following remarks by the district attorney constituted error: "Oh, he (Curran) has called that man a lot of names. But Chris Hanks, you haven't any halo over your head. Chris Hanks, you never had a halo over your head. You have never been donated any medal for being an outstanding citizen in this county or any other county." Appellant objected to the remark on the ground that the district attorney was going outside of the record. We think the remark was not entirely proper, but in view of the evidence in the case showing that appellant was engaged and had been engaged for some time in an unlawful enterprise, there was some justification for the remark and it was not prejudicially erroneous.

We have examind the other remarks to which complaint has been directed. No objection was made thereto at the time or there was some evidence supporting the inferences drawn therefrom. While we refrain from commending the practice of prosecuting attorneys becoming overzealous in securing convictions, courts are strongly inclined against setting aside convictions on the ground of misconduct of district attorneys alone. Such misconduct, therefore, is not a ground for re-

versal when it is unimportant or slight, or when it cannot prejudice the defendant, or when it appears that the verdict could not have been controlled or affected by it. Counsel's conduct must reach a course of proceeding militating against justice and the fair and orderly conduct which should characterize a judicial proceeding in a criminal case before error can be predicated upon it. Each case must be judged by its own particular circumstances, and much must be left to the discretion of a trial court in determining whether an attorney overstepped the bounds of legal propriety in his conduct of the trial, and its judgment that counsel's conduct wrought no prejudice will not be set aside unless the contrary clearly appears. (*People* v. *Mayes,* 113 Cal. 618 [45 Pac. 860]; *People* v. *Ruef,* 14 Cal. App. 576 [114 Pac. 48]; *People* v. *Owens,* 132 Cal. 469 [64 Pac. 770]; *People* v. *Warner,* 147 Cal. 546 [82 Pac. 196].) After a careful reading of the entire record, from the facts related and for the reasons expressed we are convinced that there was sufficient evidence as found by the jury under proper instructions given, to hold that the jury was justified in returning a verdict of guilty on the charge of conspiracy to commit the offense of arson, as well as the charge of attempt to commit arson. We therefore conclude that the trial court did not abuse its discretion in denying appellant's motion for new trial on the ground of misconduct of the juror; that there was sufficient corroborative evidence in the case to meet the requirements of section 1111 of the Penal Code; and that the remarks of the district attorney in his argument to the jury were not prejudicially erroneous.

The judgment and order denying the motion for a new trial and the order dismissing the appellant's motion for leave to renew his motion for a new trial or for a writ of *coram nobis* are affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 22, 1939. Houser, J., and Carter, J., voted for a hearing.